**Affirmed and Opinion filed April 17, 2012.**



In The

# Fourteenth Court of Appeals

_____

## NO. 14-11-00069-CR

_____

**JOSE ISAAS HERRERA AKA JOSE ISAAS HERRERA, SR., Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 56th District Court
Galveston County, Texas
Trial Court Cause No. 08CR3697**

## OPINION

Jose Isaas Herrera was convicted of intentionally or knowingly causing serious bodily injury to his six-week-old son, J.H., resulting in the baby's death.   He argues that the evidence is insufficient to support his conviction; that the trial court reversibly erred in allowing a State expert rebuttal witnesses to testify during the State's case in chief; that the indictment and jury charge failed to adequately specify the manner and means of the

offense; and that the trial court erred in allowing the State to present certain autopsy photographs to the jury.   We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Appellant began dating Jessica Trevino when they were in high school.   In 2007, when she was fifteen, Jessica became pregnant with a daughter, B.H.   Jessica dropped out of school and appellant began living with Jessica and her parents.   In late 2007, the Trevinos asked appellant to leave and not to date Jessica anymore.

Over the next few months, Jessica began dating the manager of the McDonald's where she was working.   Appellant found out about their relationship and was very angry. He moved back into the Trevinos' house.   When Jessica learned that she was pregnant with a son, appellant was convinced that the child was not his.   After the baby, J.H., was born in 2008, appellant asked for a paternity test, and his suspicion of J.H.'s paternity persisted throughout the child's short life.   Although people had told appellant that his daughter, B.H., looked like him, J.H. did not.   According to Jessica, appellant was not affectionate with J.H. as he had been with B.H.   Appellant told Jessica that the baby was a "faggot" and was not his child.   He also said that J.H. was a "momma's boy" and would grow up to be a "little pussy."

Jessica testified that on one occasion, she left J.H. alone with appellant and when she returned she saw that the baby had a bruise on his forehead.   Appellant told Jessica that he had accidentally bumped J.H.'s head against the bathtub while giving him a bath, but he did not generally bathe J.H.

On October 27, 2008, at about 10:30 p.m., Jessica put J.H. to bed.   She testified that she always put J.H. on his back when she left him unsupervised and that the baby could not turn over from that position unassisted.   At about 5:00 a.m., J.H. started to make noises, waking the couple up.   Appellant got up to feed the baby, and Jessica went back to sleep. At 10:15 that morning, Jessica woke up and went to check on J.H.   She found him lying

2

face-down, stiff, cold and pale. Appellant tried to perform CPR, but the baby had been dead for hours.[1]

Several police officers who responded to the Trevinos' home that day noted that appellant did not seem very emotional about J.H.'s death. When she went into appellant's and Jessica's room the night after J.H. died, Nancy, Jessica's mother, found appellant stacking J.H.'s clothes on his crib. Nancy and Jessica told appellant to stop, but appellant stated simply, "Well, he's not here no more and it needs to be put up." At the funeral later that week, according to the Trevinos, appellant did not seem perturbed. As the baby's casket was about to be lowered into the ground, appellant told Jessica to stop crying. According to Jessica's brother, who had paused in front of the casket, appellant told him, "Hurry up so we can get this over with." Maria Medina, a co-worker of Nancy Trevino's, testified that she approached appellant at the funeral to offer her condolences. According to Medina, appellant told her that "it was his fault, that he did it."[2] Medina tried to reassure appellant that the baby had died a "crib death," but, according to Medina, appellant continued to repeat that it was his fault.

The day after J.H.'s death, the Galveston County Medical Examiner's office conducted an autopsy of J.H.'s body. The autopsy showed that the baby had suffered fourteen fractures, including several broken ribs and a broken spine. Two of these were "old fractures," but twelve occurred at or around the time of death. There were also abrasions between the baby's shoulder blades and hemorrhaging in the baby's chest, abdomen, the front left side of his head, and the back of his head. Additionally, there was a deep scratch above J.H.'s right eye.

---

[1] Dr. Stephen Pustilnik, Chief Medical Examiner for Galveston County, testified that the symptoms Jessica and appellant observed occur only several hours after death. They include rigor mortis (a stiffening of muscular flexors and extensors due to lack of oxygen), lividity (the settling of the blood due to lack of oxygen and circulation), and a steep drop in body temperature.

[2] On cross-examination, Medina read from an earlier statement she had given the police in which she had described appellant saying "it's my fault, it's my fault" but not "I did it."

3

A Child Protective Services investigator, David Henry, interviewed appellant three days after J.H. died. Appellant said that he may have dropped or shaken J.H. while administering CPR, a possibility he had not mentioned in earlier interviews with the police. In any case, according to Dr. Stephen Pustilnik, Galveston County's Chief Medical Examiner, the hemorrhaging around the fractures indicated that they could not have been inflicted post-mortem.

Appellant was initially charged with murder on December 17, 2008. The indictment alleged that appellant

> intentionally or knowingly cause[d] the death of an individual, namely, [J.H.], by then and there shaking the said [J.H.] with the hand or hands of [appellant], or by throwing the said [J.H.], or by causing the spinal cord and/or spinal column to extend or bend until it broke in a manner which is unknown to the Grand Jury . . . and [appellant] . . . used or exhibited a deadly weapon, to-wit: the hand or hands of [appellant], or an object which is unknown to the Grand Jury, during the commission of the said offense.

Appellant was re-indicted for murder on September 16, 2010. The re-indictment omitted the possibility that appellant had caused J.H.'s death by shaking and added two other possible means of causing his death: the infliction of blunt force trauma (with appellant's hand or hands or an unknown object), and the dropping of J.H. It was otherwise identical to the first indictment. Appellant moved to quash the re-indictment on the ground that it described as "unknown to the Grand Jury" the object used to inflict blunt force trauma on J.H., the manner in which J.H.'s back was broken, and the deadly weapon used or exhibited. At a hearing on appellant's motion to quash, the State represented that

> [w]e have tried to give as good a notice as we can on a very complicated infant death. . . . Essentially what the Medical Examiner could tell us and we could then in turn tell the Grand Jury is that these multiple injuries, essentially the cause of death was blunt force injuries. . . . [T]he evidence may show that it is unknowable by virtue of the fact that we do not have a confession. We do not have an eyewitness. We have multiple traumas to a

4

six-week-old infant.  So, it is a circumstantial case.  We do not have a confession.

The trial court denied appellant's motion to quash without explanation.  Three days later, the State re-indicted appellant for murder.  The only substantial change was the reinsertion of "shaking" as a possible cause of death, but appellant again moved to quash the re-indictment.[3]  In this motion, he also requested a pretrial hearing to "ensure that the 'unknown' allegation was truly unknown to the grand jury and is not being used to surprise or manipulate the defendant. . . . [and elicit] all evidence that is now known so that the 'unknown' aspect of the case can be eliminated."  At a hearing on this second motion, the State represented that

> [e]ssentially what we have is due diligence on the part of the State and on the part of the Medical Examiner to try to piece together the evidence and come up with a conclusion beyond a reasonable doubt of what we can prove as to the manner and means.  We know that it was blunt force trauma.  We know that there are old injuries, that there are new injuries.  We know that it could be consistent with hand or hands or vigorous shaking.  But quite frankly, it's unknown and it may be unknowable because this was a six-week-old infant.  And the only person that we believe was present was the Defendant. . . . And he did not give a confession.

The trial court again denied appellant's motion to quash.  In appellant's final re-indictment, dated November 4, 2010, the charge was changed from murder to intentionally or knowingly causing serious bodily injury to J.H.

> by then and there inflicting blunt force trauma to the head and/or torso of the said [J.H.] with the hand or hands of [appellant], and/or with or against an object unknown to the Grand Jury, and/or by shaking, and/or throwing, and/or dropping the said [J.H.], and/or by causing the spinal cord and/or

---

[3]  Between appellant's first and second motions to quash, the Court of Criminal Appeals decided *Sanchez v. State*, No. PD-0961-07, 2010 WL 3894640, at *1 (Tex. Crim. App. Oct. 6, 2010) (motion for rehearing pending).  *Sanchez* provides for a pretrial hearing to determine if the defendant has been given proper notice to prepare for trial and to determine whether the "unknown" aspect of the case can be minimized or eliminated by amending the indictment or presenting a superseding indictment.  *Id.*, 2010 WL 3894640, at *5.

spinal column of the said [J.H.], to extend and/or bend until broken in a manner which is unknown to the Grand Jury.

The indictment also contains a notice of intent to seek a deadly weapon finding in which it is alleged that appellant

used or exhibited a deadly weapon, to-wit: the hand or hands of [appellant] or an object which is unknown to the Grand Jury, during the commission of the said offense.

Appellant moved to quash the re-indictment on the same grounds as in his earlier motions, and the trial court denied his motion without a hearing.

Dr. Pustilnik and Dr. Nobby Mambo, Deputy Medical Examiner for Galveston County, were the State's primary medical experts. Both testified that they believed J.H.'s death was a homicide and that the cause of death was blunt force trauma. Dr. Mambo stated that he believed the trauma was caused by vigorous shaking. According to Dr. Pustilnik, J.H.'s injuries were consistent with his having been slammed, thrown, dropped "from a height onto some object across its back," or "an injurious shake, one where the head is going back and forth so far that you're thinking the neck is going to snap off . . . ." Dr. Pustilnik also said that the injuries could have been caused by someone applying force to J.H.'s back as he lay face-down, hyper extending J.H.'s back to the point that the spine broke.

The State also designated two rebuttal witnesses who would primarily testify that J.H.'s rib and back fractures could not have occurred post-mortem. Dr. Randall Frost is the Chief Medical Examiner of Bexar County and one of the State's rebuttal witnesses. At the end of the first week of trial, the State approached the bench to request that Dr. Frost be allowed to testify the next week before Dr. Pustilnik had been cross examined. The State represented that Dr. Frost would base his testimony on slides taken at J.H.'s autopsy. Because Dr. Frost was not present at the autopsy, however, the State would rely on Dr. Pustilnik to validate the slides. Due to scheduling issues, the State requested that Dr. Frost be allowed to testify before the State had completed Dr. Pustilnik's direct examination.

6

Appellant asked the trial court to exclude Dr. Frost's testimony because appellant was entitled to cross examine Dr. Pustilnik about the slides before Dr. Frost testified to conclusions based on them. Appellant also objected to allowing a rebuttal witness to testify during the State's case in chief, asserting that this would violate a discovery order in which the trial court had required the State to provide appellant with "a list of all the names of prospective prosecution witnesses who . . . likely will be used a[t] the guilt/innocence phase . . . with a continuing duty on the part of the State to disclose the names of rebuttal witnesses as soon as they become known." The State had identified Dr. Frost as a rebuttal witness but not as a primary witness. Finally, appellant argued that Dr. Frost's testimony was hearsay and cumulative. The trial court denied appellant's motion to exclude Dr. Frost's testimony, with the proviso that "should the state not be able to prove up those slides as coming from the deceased victim in this case, then I will give an instruction to the jury to disregard any and all testimony by Dr. Frost."

When the State introduced Dr. Frost's testimony midway through Dr. Pustilnik's testimony the following week, appellant raised the same objections as at the previous week's bench conference. He additionally argued that he was unfairly surprised by Dr. Frost's testimony because the State had listed Dr. Frost's first name as "Robert" rather than "Randall." The trial court allowed appellant two hours to "review whatever you need" before Dr. Frost testified. After two hours, appellant did not request more time and Dr. Frost testified. During his testimony, the slides were admitted with the instruction that they were not to be considered for the purpose of proving J.H. suffered the injuries shown. During the next part of Dr. Pustilnik's direct examination, the slides were admitted in full.

The State also introduced the testimony of Christopher Altizer, who met appellant when the two were in jail together after appellant's arrest. Altizer testified that appellant approached him one day in the recreation yard and said he needed to get something off his chest. According to Altizer, appellant told him that "he was on drugs and his baby wouldn't stop crying and he hit it." Appellant denied that this conversation took place.

7

The trial court submitted, in relevant part, the following jury charge:

Now, if you find from the evidence beyond a reasonable doubt that on or about the 27th day of October, A.D., 2008, in Galveston County, Texas [appellant] did then and there intentionally or knowingly cause serious bodily injury to [J.H.], a child 14 years of age or younger, by then and there inflicting blunt force trauma to the head and/or torso of the said [J.H.], with the hand or hands of the said [appellant], and/or with or against an object unknown to the Grand Jury, and/or by shaking, and/or throwing, and/or dropping the said [J.H.], and/or by causing the spinal cord and/or spinal column of the said [J.H.] to extend and/or bend until broken in a manner which is unknown to the Grand Jury, then you will find the Defendant guilty of Intentional or Knowing Serious Bodily Injury to a Child.

Appellant asked the trial court to strike those portions of the jury charge referencing matters "unknown to the Grand Jury." The trial court denied appellant's motion. The jury convicted appellant of intentionally or knowingly causing serious bodily injury to a child, sentenced him to life in prison, and assessed a $10,000 fine. Appellant's motion for new trial was denied and he timely appealed.

## II.  ISSUES PRESENTED

In five issues, appellant contends that (1) the evidence is insufficient to support his conviction; (2) the trial court erred in allowing the State to call Dr. Frost out of order; (3) the indictment was not specific enough about the manner and means of the offense; (4) the trial court erred in incorporating the language of the indictment into the jury charge; and (5) the trial court erred in allowing the jury to see autopsy photographs.

## III.  ANALYSIS

### A.  Sufficiency of the Evidence

Appellant first argues that the evidence is insufficient to support his conviction. In evaluating this challenge to the sufficiency of the evidence, we consider all the evidence in the light most favorable to the verdict. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979); *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010) (plurality op.); *id* at 912–13 (Cochran, J. concurring). If, when viewed in this

8

light, any rational factfinder could have found the essential elements of the offense beyond a reasonable doubt, then the evidence is sufficient to support the verdict. *Jackson*, 443 U.S. at 319; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

A person commits injury to a child if he intentionally, knowingly, recklessly, or with criminal recklessness causes a child serious bodily injury. TEX. PENAL CODE ANN. § 22.04(a)(1) (West 2011). Serious bodily injury is a "bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." *Id.*, §1.07(a)(46). A person who causes such an injury intentionally or knowingly commits a felony of the first degree. *Id.* § 22.04(e). A person acts intentionally with respect to a result of his conduct when it is his conscious objective or desire to cause the result. *Id.*, § 6.03(a). A person acts knowingly with respect to a result of his conduct when he is aware that his conduct is reasonably likely to cause the result. *Id.*, § 6.03(b).

Viewed in the light most favorable to the verdict, the evidence shows as follows:

- When Jessica put J.H. to bed, he had not yet suffered the severe injuries found in the autopsy. Appellant got up to feed J.H. at 5:00 a.m.., some five hours before J.H. was found dead. Dr. Pustilnik testified that based on J.H.'s physical condition, J.H. had been dead for several hours by the time he was found at about 10:15 a.m., five hours later, with the injuries. Thus, he must have died no earlier than 5:00 a.m. but at least several hours before 10:15 a.m. The injuries also must have occurred around the time of J.H.'s death, as Dr. Pustilnik testified that the hemorrhaging around the fractures indicated that they could not have been inflicted post-mortem (such as by the CPR appellant conducted several hours after the baby's death) and that the baby did not survive long after sustaining them. There is no evidence that anyone else was up with the baby between 5:00 a.m. and 10:15 a.m., when J.H. was found dead, and J.H. could not have caused the injuries to himself. This evidence points to appellant as the likely perpetrator. *See Martin v. State*, 246 S.W.3d 246,

9

262 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (citing, among other circumstances, the fact that defendant was alone with baby during the time in which the baby suffered blunt force trauma as legally sufficient evidence of guilt).

- Appellant told Christopher Altizer that he was on drugs and hit the baby because the baby would not stop crying.

- Appellant told Maria Medina, a co-worker of Nancy Trevino's, that "it was his fault, that he did it."

- Appellant stacked J.H.'s clothes in his crib the day J.H. died. The Trevinos were disturbed by this behavior, and the police also found it unusual.

- Appellant apparently believed that J.H. was not his child and sought to have paternity tests. He called J.H. a "faggot" and insisted that the baby was not his. Jessica and her brother testified that he showed little affection for J.H. compared with B.H.

- The Trevinos testified that appellant did not seem very emotional about the baby's death or at the funeral. At the funeral, he told Jessica to stop crying. He also told Jessica's brother, who had stopped at the casket, "Hurry up so we can get this over with."

Taken together in the light most favorable to the verdict, this record supports the jury's finding that appellant caused serious bodily injury to J.H. *See Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) (circumstantial evidence alone is sufficient to establish guilt); *Martin*, 446 S.W.3d at 262 (citing as legally sufficient evidence appellant's failure to call 9–1–1 and her delay in getting victim to the emergency room, several witnesses' testimony regarding her demeanor and behavior in the ambulance and at the emergency room, child's father's testimony that victim's crying got on appellant's nerves, appellant's past statements to child's father threatening to drown victim in the bathtub if he did not pick her up, medical testimony that child suffered from malnutrition, and testimony

10

appellant was a violent and untruthful person); *see also Alexander v. State*, 229 S.W.3d 731, 739 (Tex. App.—San Antonio 2007, pet. ref'd) (evidence legally sufficient to support murder where appellant had demonstrated abusive relationship with child, appellant had been seen hitting child with vacuum cleaner attachment earlier in the day, child was found fatally injured after being alone with appellant, and medical testimony supported finding that child was killed with the attachment).

The severity and number of J.H.'s injuries also support a finding that appellant caused them intentionally or knowingly. Intent can be inferred from the extent of the injuries to the victim, the method used to produce the injuries, and the relative size and strength of the parties. *Patrick v. State*, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995). Appellant, a grown man, was with J.H. at the approximate time the baby sustained extremely severe injuries. According to Dr. Pustilnik, J.H.'s injuries were consistent with his having been slammed, thrown, dropped "from a height onto some object across its back," or "an injurious shake, one where the head is going back and forth so far that you're thinking the neck is going to snap off . . . ." *See Montgomery v. State*, 198 S.W.3d 67, 87 (Tex. App.—Fort Worth 2006, pet. ref'd) (using the severity of the injuries sustained by the infant as evidence of the appellant's intent).

Finally, with respect to the deadly weapon finding, Dr. Pustilnik testified as follows:

[STATE]: Now, in your experience of having done hundreds of the autopsies, do you have an opinion as to whether or not somebody's hand or hands, depending on how it's used, can be deadly weapons?
[DR. PUSTILNIK]: Yes.
[STATE]: And can they be deadly weapons?
[DR. PUSTILNIK]: They most certainly can.
[STATE]: Hypothetically if you use your hand or hands to strike someone or to punch someone, could they—if they then cause death, could that be a deadly weapon?
[DR. PUSTILNIK]: Yes, the hands could be a deadly weapon in that situation.

11

This testimony permitted the jury to find that appellant used or displayed his hands as a deadly weapon. Appellant nonetheless argues that the evidence is insufficient to support his conviction because the State failed to prove the means by which appellant injured J.H. and could only prove that the death resulted from blunt force trauma. According to appellant, "the means . . . is the entire crux of the trial." But for the purpose of appellant's conviction (as opposed to the specificity required in the indictment or jury charge, which we address later), the means by which appellant injured J.H. is irrelevant—what matters is that he intentionally or knowingly caused a serious bodily injury by at least one of the means listed in the indictment. *See Kitchens v. State*, 823 S.W.2d 256, 258–59 (Tex. Crim. App. 1991) (when jury returns general "guilty" verdict on an indictment charging alternative theories of committing the same offense, the verdict stands if evidence supports any of the theories alleged). Viewed in a light most favorable to the verdict, the evidence supports such a finding. We overrule appellant's first issue.

## B.     Expert Testimony

Appellant next argues that the trial court erred in allowing Dr. Frost to testify during the State's case in chief before appellant had cross examined Dr. Pustilnik. At trial and on appeal, appellant argues that (1) the trial court deprived appellant of his Sixth Amendment right to confront Dr. Pustilnik, whose staff created the slides for the autopsy report, before Dr. Frost could testify based on the slides; and (2) the State violated the trial court's discovery order by calling Dr. Frost during the State's case in chief even though he had been designated as a rebuttal witness. Appellant also argues that the trial court erred in allowing another State rebuttal witness, Dr. Harrell Gill-King, to testify "out of order as a rebuttal witness" during *appellant's* case in chief. We apply an abuse-of-discretion standard of review to all of these issues except for appellant's Sixth Amendment issue. *See State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006) (a trial court's ruling admitting or excluding evidence is reviewed for an abuse of discretion). As to appellant's Sixth Amendment issue, we review the trial court's ruling de novo. *See Wall v. State*, 184

12

S.W.3d 730, 742 (Tex. Crim. App. 2006) (a trial court's ruling as to whether a statement is testimonial or non-testimonial for Sixth Amendment purposes is reviewed de novo).

The Sixth Amendment right to confront witnesses applies not only to in-court testimony but also to out-of-court statements that are testimonial in nature. *Crawford v. Washington*, 541 U.S. 36, 50–51, 124 S. Ct. 1354, 1364, 158 L. Ed. 2d 177 (2004). The Confrontation Clause forbids the admission of testimonial hearsay unless the declarant is unavailable to testify and the defendant had a prior opportunity to cross-examine the declarant. *Id.*, 541 U.S. at 68, 124 S. Ct. at 1374. In *Melendaz-Diaz v. Massachusetts*, the Supreme Court held that reports prepared by analysts at a state crime laboratory stating that a substance was cocaine were testimonial statements, and that the analysts who prepared the report were therefore witnesses whom the defendant had the right to cross-examine under the Sixth Amendment. 557 U.S. 305, 310, 129 S. Ct. 2527, 2532, 174 L. Ed. 2d 314 (2009). As the Court explained, the reports issued were "incontrovertibly a 'solemn declaration or affirmation made for the purpose of establishing or proving some fact . . .'" and therefore testimonial. *Id.* (quoting *Crawford*, 541 U.S. at 51, 124 S. Ct. 1354). Appellant argues that that the autopsy slides were similarly testimonial in nature because Dr. Pustilnik's office used them in preparing the autopsy report, and he therefore had a right to cross-examine Dr. Pustilnik before Dr. Frost testified. An autopsy photograph, however, is not a testimonial statement. *See Wood v. State*, 299 S.W.3d 200, 214–15 (Tex. App.—Austin 2009, no pet.) ("The admission in evidence of the [autopsy] photographs, Dolinak's descriptions of the injuries shown in the photographs, and Dolinak's conclusions as to likely causes of those injuries did not disclose to the jury any testimonial hearsay and thus did not violate the Confrontation Clause."); *Hamilton v. State*, 300 S.W.3d 14, 22 (Tex. App.—San Antonio 2009, pet. ref'd) (expert opinion based on data generated by scientific instruments operated by other scientists not testimonial hearsay); *accord* TEX. R. EVID. 801(a) (a photograph is not an out-of-court statement for hearsay purposes). Because the autopsy photographs were not testimonial and Dr. Frost was subject to cross-examination about his own interpretation of

13

the slides, appellant fully enjoyed his Sixth Amendment rights as to all testimonial evidence introduced against him. Moreover, appellant ultimately did have the opportunity to cross-examine Dr. Pustilnik. The opportunity to do so did not arise until after Dr. Frost had testified, but in the interim, the trial court instructed the jury not to consider Dr. Frost's testimony as evidence that J.H. suffered the injuries shown in the slides unless and until their admissibility was established. *See Moore v. State*, 822 S.W.2d 844, 847 (Tex. Crim. App. 1994) (we presume that the jury follows the trial court's instructions and that a limiting instruction cures any harm).

We next turn to appellant's argument that the trial court should have excluded Dr. Frost's testimony because the State violated the trial court's discovery order by introducing Dr. Frost's testimony during its case-in-chief after designating him as a rebuttal witness. Appellant argues that this designation deprived him of time to prepare for Dr. Frost's testimony. When appellant objected at trial, the trial court allowed appellant two hours to prepare for Dr. Frost's testimony. At the end of this time, appellant did not request a further continuance or voice any objection. We conclude that appellant has waived further complaint about this issue. *See Duff-Smith v. State*, 685 S.W.2d 26, 33 (Tex. Crim. App. 1985) ("It is well settled that the proper procedure when alleging surprise due to violation of a trial court's order for discovery is to object or ask for a postponement or continuance of the trial.").

Finally, appellant argues that the trial court erred in allowing Dr. Gill-King to testify "out of order as a rebuttal witness." The State designated Dr. Gill-King as a rebuttal witness before trial and called him to the stand after appellant had cross-examined Dr. Pustilnik and called his own expert witness. The following exchange took place:

[THE STATE]: State would request being able to call a witness out of order for rebuttal, if we may.

[THE COURT]: Is that okay with you, Mr. Verret?

[APPELLANT]: Yes.

Thus, appellant failed to preserve error as to this point. We overrule appellant's second issue.

## C. Indictment

Appellant next contends that the trial court erred in denying his motion to quash the indictment. After his first two motions to quash were denied at hearings, appellant moved to quash his final re-indictment for causing serious bodily injury to J.H. The trial court denied his motion by written order. Appellant argues that the trial court erred in denying his motion to quash the final indictment because it failed to give him adequate notice of the manner and means of the charged offense.

We review de novo a trial court's denial of a motion to quash an indictment. *Lawrence v. State*, 240 S.W.3d 912 915 (Tex. Crim. App. 2007). A motion to quash should be granted only where the language concerning the defendant's conduct is so vague or indefinite as to deny the defendant effective notice of the acts he allegedly committed. *DeVaughn v. State*, 749 S.W.2d 62, 67 (Tex. Crim. App. 1988). A charging instrument which tracks the language of a criminal statute possesses sufficient specificity to provide a defendant with notice of a charged offense in most circumstances. *State v. Edmond*, 933 S.W.2d 120, 128 (Tex. Crim. App. 1996) (citing *Bynum v. State*, 767 S.W.2d 769, 778 (Tex. Crim. App. 1988)).

The indictment in this case tracked the language of the statute. As noted above, the statute provides that a person commits injury to a child if he intentionally, knowingly, recklessly, or with criminal recklessness causes a child serious bodily injury. TEX. PENAL CODE ANN. § 22.04(a)(1). The indictment charges that appellant

> did then and there intentionally or knowingly cause serious bodily injury to [J.H.], a child 14 years of age or younger, by then and there inflicting blunt force trauma to the head and/or torso of the said [J.H.] . . . .

*See Perez v. State*, 261 S.W.3d 760 (Tex. App.—Houston [14th Dist.] 2008, pet. ref'd) (where appellant was charged with causing serious bodily injury to a child "by causing

15

forceful trauma to the Complainant's head in a manner and means unknown to the Grand Jury, and during the course of the offense the Defendant did use a deadly weapon, the nature and description of which is unknown to the Grand Jury," court held that the indictment provided adequate notice to appellant).

Appellant cites a recent Court of Criminal Appeals case, *Sanchez v. State*, as proof that the State can no longer allege that the manner and means of committing an offense are unknown. *See Sanchez*, No. PD-0961-07, 2010 WL 3894640, at *1 (Tex. Crim. App. Oct. 6, 2010) (motion for rehearing pending). However, the *Sanchez* court expressly disavowed appellant's interpretation of its opinion. *See id.*, 2010 WL 3894640, at *6 ("Our opinion should not be read to restrict or alter the use of the "unknown" allegation in an indictment. This new standard merely provides the opportunity to avoid confusion and error in the jury charge with respect to unknown allegations."). Under *Sanchez*, appellant is only entitled to a pretrial hearing to determine if he had been given proper notice to prepare for trial and to clarify whether the "unknown" aspect of the case could be minimized or eliminated by amending the indictment or presenting a superseding indictment. *Id.*, 2010 WL 3894640, at *5. Appellant essentially obtained two such hearings on his motions to quash the two murder re-indictments, which contained substantially the same language as his final re-indictment for causing a serious bodily injury.[4] Appellant did not obtain a hearing on his final motion to quash, which pertained to the re-indictment for causing serious bodily injury to a child, but the contested language was common to all of the indictments. We overrule appellant's third issue.

## D. Jury Charge

In his fourth issue, appellant argues that the trial court erred in incorporating into the jury charge the language in the indictment describing as "unknown to the Grand Jury" the means by which appellant inflicted blunt force trauma on J.H., the manner in which J.H.'s

---

[4] The State did not produce evidence at these hearings, but it represented to the trial court that the unknown matters could not be clarified by the State's witnesses at that time.

spine broke, and the deadly weapon appellant used or displayed. In our review of a jury charge, we first determine whether error occurred. *See Abdnor v. State*, 871 S.W.2d 726, 731–32 (Tex. Crim. App. 1994). If error occurred, we then evaluate whether sufficient harm resulted from the error to require reversal. *Id.*

The trial court charged the jury as follows:

Now, if you find from the evidence beyond a reasonable doubt that on or about the 27th day of October, A.D., 2008, in Galveston County, Texas [appellant] did then and there intentionally or knowingly cause serious bodily injury to [J.H.], a child 14 years of age or younger, by then and there inflicting blunt force trauma to the head and/or torso of the said [J.H.], with the hand or hands of the said [appellant], and/or with or against an object unknown to the Grand Jury, and/or by shaking, and/or throwing, and/or dropping the said [J.H.], and/or by causing the spinal cord and/or spinal column of the said [J.H.] to extend and/or bend until broken in a manner which is unknown to the Grand Jury, then you will find the Defendant guilty of Intentional or Knowing Serious Bodily Injury to a Child.

The jury was also asked to return a deadly weapon finding as to "the hand or hands of [appellant] or an object which is unknown to the Grand Jury."

We understand appellant to argue that the "unknown" matters became known by the time the judge charged the jury, and that this language should have been replaced accordingly. First, we disagree that the evidence at trial in fact clarified the unknown matters. But we need not address whether it did, because any charge error was harmless given that the evidence supports a conviction under one or more of the other theories charged in the indictment and submitted to the jury. When a jury returns a general "guilty" verdict on an indictment charging alternative methods of committing the same offense, the verdict stands if the evidence is sufficient to support a finding under any of the theories submitted. *Kitchens v. State*, 823 S.W.2d 256, 258–59 (Tex. Crim. App. 1991). If the evidence is sufficient to support a finding of guilt based on at least one of the alternative theories, then the verdict stands. *Rosales v. State*, 4 S.W.3d 228, 231 (Tex. Crim. App. 1999); *Kitchens*, 823 S.W.2d at 258–59. Thus, even if one of the alternative theories was erroneously submitted to the jury, a conviction still may stand if found under

17

another submitted theory. In the case under review, the evidence supports a conviction based upon a finding that appellant committed the offense by shaking, throwing, or dropping J.H. The jury could have convicted on any one of these theories without ever reaching the "unknown" language. Similarly, the jury could have concluded that appellant inflicted the trauma with his hands rather than with an unknown object, and that he used or exhibited his hands—rather than an unknown weapon—in the commission of the offense. In no part of the indictment was an "unknown" matter the sole basis on which the jury could convict. Thus, even if there were error in the charge as alleged by appellant, that error would be harmless because the evidence is sufficient to support a finding of guilt on at least one of the alternative theories. *See Rosales*, 4 S.W.3d at 231; *Kitchens*, 823 S.W.2d at 258–59. We overrule appellant's fourth issue.

### E.      Autopsy Photographs

Finally, appellant argues that the trial court erred in admitting photographs from J.H.'s autopsy because they were "cumulative and inflammatory." Under Texas Rule of Evidence 403, a photograph is admissible if it has probative value that is not substantially outweighed by the photograph's inflammatory nature. TEX. R. EVID. 403; *Williams v. State*, 301 S.W.3d 675, 690 (Tex. Crim. App. 2009). Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial. *Shuffield v. State*, 189 S.W.3d 782, 787 (Tex. Crim. App. 2006). Analysis under the rule should generally consider: (1) how probative the evidence is, (2) the potential of the evidence to impress the jury in some irrational, but nevertheless indelible way, (3) the time the proponent needs to develop the evidence; and (4) the proponent's need for the evidence. *Id.* A number of additional factors may also be relevant in determining whether the probative value of photographs is substantially outweighed by the danger of unfair prejudice, including: the number of photographs offered, their gruesomeness, their detail, their size, whether they are in color or black-and-white, whether they are close-up images, whether the body depicted is clothed or naked, the availability of other means of proof, and other circumstances unique to the

18

individual case. *Williams*, 301 S.W.3d at 690 (citing *Long v. State*, 823 S.W.2d 259, 272 (Tex. Crim. App. 1991)). Autopsy photographs are generally admissible unless they depict mutilation of the victim caused by the autopsy itself. *Id.* However, mutilation caused during an autopsy is not necessarily fatal to the admissibility of a photograph if the photograph is highly probative of the medical examiner's findings and conclusions or when it allows the jury to see an internal injury. *See Gallo v. State*, 239 S.W.3d 757, 763 (Tex. Crim. App. 2007); *Harris v. State*, 661 S.W.2d 106, 108 (Tex. Crim. App. 1983). We review a trial court's decision to admit or exclude evidence under an abuse-of -discretion standard. *Torres v. State*, 71 S.W.3d 758, 760 (Tex. Crim. App. 2002). We will uphold the trial court's ruling as long as it was within the zone of reasonable disagreement. *Rayford v. State*, 125 S.W.3d 521, 529 (Tex. Crim. App. 2004).

During Dr. Pustilnik's testimony, the State tendered several photographs for him to identify and explain to the jury. Of these, appellant objected to those marked as exhibits 61, 69, 75, and 76, and the trial court overrruled his objections. Exhibit 61 is a frontal picture of J.H. with several marks on his body. Exhibit 69 is a frontal picture of the baby's body with much of the skin flayed back to show internal damage. Exhibit 75 is a picture of J.H.'s skull with the skullcap removed, and Exhibit 76 is a picture of the exposed skull with the skin around it flayed back. Having examined each contested photograph and Dr. Pustilnik's testimony, we conclude that the trial court did not abuse its discretion in admitting the photographs. Dr. Pustilnik testified that he had chosen these pictures from a much larger set in order to identify and explain J.H.'s injuries to the jury. He used each photograph to explain J.H.'s injuries to the jury in ways that were probative of appellant's guilt. Exhibit 61, for example, shows "the pattern of lividity around the face and the paleness on the right side of the face, nose, right cheek area. That is where the face rested . . . after the heart stopped beating and the blood stopped circulating." Jessica testified that she put J.H. on his back when she put him to bed and that J.H. could not move himself from that position. Exhibit 61 demonstrates that the baby was on his side or back after his death, meaning either that Jessica was wrong or that someone else turned the baby

19

over. Exhibit 69 shows hemorrhaging that, according to the State's medical experts, is not consistent with a post-mortem injury, indicating that J.H's ribs were not broken by appellant's CPR after the baby's death. Exhibit 75 shows no subdural hemorrhaging, meaning, according to Dr. Postilnik, that the baby likely did not die from being shaken back and forth repeatedly. Exhibit 76 shows hemorrhaging on the back of the head, which Dr. Pustilnik testified is independent evidence of blunt force trauma.

The images are gruesome, but autopsy photographs often will be; sometimes it is impossible to show an injury that the defendant caused without altering the body in some way. *See, e.g.*, *Davis v. State*, 313 S.W.3d 317, 331 (Tex. Crim. App. 2010) (photograph of cross-sectioned tongue was admissible because it showed an injury that was not otherwise visible); *Gallo*, 239 S.W.3d at 763 (concluding trial court did not err by admitting photographs of the decedent's rib, skull cap, and brain, all visible due to the decedent's autopsy, because they were necessary to show the injuries sustained); *Harris*, 661 S.W.2d at 108 (concluding trial court did not err by admitting photograph of decedent's skull with skin refracted because it was necessary to show a skull fracture); *Drew v. State*, 76 S.W.3d 436 (Tex. App.—Houston [14th Dist.] 2002, pet. ref'd) (where relevant to explain injuries, trial court did not err in admitting autopsy photographs showing victim's head with the top part of the skull sawed off, exposing the brain; the skull with the scalp pulled over victim's face; the interior part of the skull with the brain removed; the brain outside the skull; and the excised windpipe).

We hold that the trial court did not abuse its discretion by concluding that the probative value of the photographs was not substantially outweighed by the potential for unfair prejudice and overrule appellant's final issue.

## IV. CONCLUSION

We conclude that the evidence is sufficient to support appellant's conviction; that the trial court did not err in allowing Dr. Frost to testify during the State's case in chief; that the trial court did not err in denying appellant's motion to quash the indictment; that even if

20

the charge contains error as alleged by appellant, that error is harmless; and that the trial court did not abuse its discretion in admitting J.H.'s autopsy photographs.   Accordingly, we affirm.


/s/      Tracy Christopher
Justice


Panel consists of Justices Frost, Brown, and Christopher.

Publish — TEX. R. APP. P. 47.2(b).

21