**Affirmed and Memorandum Opinion filed January 29, 2019.**



In The

# Fourteenth Court of Appeals

### NO. 14-17-00588-CR

**THERESA SERRANO, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 337th District Court
Harris County, Texas
Trial Court Cause No. 1490307**

# MEMORANDUM OPINION

Appellant Theresa Serrano appeals her conviction for the murder of her wife, complainant Karen Sanqui. A jury found appellant guilty and assessed her punishment at 45 years in prison. In two issues, appellant contends that (1) the evidence was insufficient to support the jury's conclusion that she possessed the required mental state for murder, and (2) the trial court erred in refusing to instruct the jury on the defense of necessity. We affirm.

## *Background*

At trial, appellant and the State presented sharply contrasting evidence regarding the events that led to Sanqui's death. Appellant testified that Sanqui was killed when a handgun discharged as appellant was trying to prevent Sanqui from killing herself. The State presented evidence refuting many of appellant's assertions and suggesting that she intentionally or knowingly caused Sanqui's death.

Appellant and Sanqui were married in 2008, but by September 2016, they were living apart. Appellant testified that Sanqui had been estranged from her family due to their marriage and Sanqui began acting differently after Sanqui's mother became ill and subsequently died. According to appellant, after her mother's death, Sanqui became depressed, lost weight, became more masculine in appearance, including cutting her hair, and started keeping a large number of dogs.[1] On September 16, 2016, appellant says that she went to Sanqui's house to discuss their finances, but Sanqui was not home. Appellant says that she let herself in, cared for the dogs, packed some of her clothing in a bag, and then fell asleep while waiting for Sanqui. Eventually, appellant woke and called Sanqui, and they spoke on the phone before Sanqui arrived at the house. Appellant said that at first, the discussion was civil, but when Sanqui arrived and saw that appellant had packed a bag, Sanqui's demeanor changed. According to appellant, Sanqui kept several guns in the house, and at this point, Sanqui grabbed a handgun and pointed it at appellant. After appellant ran to a bathroom and shut the door, Sanqui threatened to kill herself. Appellant said that Sanqui had made similar threats while holding a gun three or four times in the previous year.

Sanqui entered the bathroom, squatted next to appellant, and pointed the

---

[1] Appellant's mother confirmed in her testimony that Sanqui had lost weight and cut her hair short.

handgun alternately at appellant and her own chin. According to appellant, Sanqui said that she knew she had messed up and that appellant was moving on with her life and getting engaged to someone else. After appellant pushed Sanqui away and they both stood up, Sanqui continued to say that she knew appellant was "happy with someone else" and that Sanqui had "lost [appellant] forever." At that point, according to appellant, Sanqui again threatened to kill herself, and when Sanqui cocked the handgun's hammer, appellant grabbed the gun and they struggled over control of it. The gun then discharged and Sanqui fell to the floor, having been shot in the forehead. Appellant called 911 and attempted to stop the bleeding. Sanqui was subsequently transported to a hospital where she was pronounced dead.

Harris County Sheriff's deputies responded to the scene, and Sergeant Veronica Riojas took a statement from appellant. Riojas testified that appellant vacillated between being calm and upset during their conversation and that she made sounds like she was vomiting but did not actually vomit. Riojas described this action as appearing to be "fake." Riojas further opined that she thought appellant's responses seemed rehearsed, and she noted that appellant's knowledge of the handgun varied, referring to it at times as "the .22" and referencing "the clip" but then not knowing what the hammer was called and referring to it as "the thingy."

During the interview, which was played for the jury, appellant said that she told Sanqui that she wanted a divorce, wanted to see other people, and was not in love with Sanqui anymore. Appellant stated that after Sanqui's mother died, Sanqui began drinking heavily, gambling, and taking drugs, some of which she had obtained from her cousin. Appellant said that Sanqui was depressed and had previously threatened to kill herself and appellant. Appellant asserted that a friend of theirs, Jessica Escobar, had warned her about Sanqui's suicidal tendencies because Sanqui had allegedly tried to hang herself while in the Air Force.

3

Regarding the night Sanqui died, appellant described Sanqui cocking the hammer after which a struggle ensued for control of the gun. Appellant said that she put both of her hands on Sanqui's hands and stuck a finger behind the trigger but then the gun fired. She maintained that she knew the bullet struck Sanqui's head, but she did not know where. She further suggested that everyone they knew was aware of Sanqui's depression. When Riojas attempted to question appellant a couple of months later to clarify some of her statements, appellant refused to answer Riojas's questions. A recording of this attempted interview was also played for the jury.

Sergeant Riojas additionally described obtaining information from several sources casting doubt on appellant's version of events. This information included Sanqui's medical records, which showed she tested negative for depression, did not show any signs of alcohol or drug abuse, and had not lost the amount of weight appellant suggested that she did. Riojas also obtained appellant's cell phone, and activity logs from the phone were admitted into evidence. According to these logs, the texts between appellant and Sanqui in the days leading up to Sanqui's death showed that it was appellant, not Sanqui, who was having more difficulty with the break up, it was appellant who spoke of wanting to die, and it was appellant who threatened Sanqui.[2] In contrast to appellant's texts, Sanqui's communication to appellant did not reveal much in the way of sadness or anger and referenced nothing in regards to suicidal or otherwise violent thoughts. Additionally, in email messages appellant sent to herself from her phone, she further described her pain, her suicidal

---

[2] For example, in one among several such messages, appellant told Sanqui "I want to die Karen you have no idea how much I want to die." In other messages to Sanqui, appellant said, "I find it interesting that at a time like this u can go out n have fun n move on so easily . . . while I cry every night" and "these past few days have been hell for me n u are a fucking horrible person." Approximately 10 hours before appellant called 911 to report Sanqui's injury, she sent Sanqui messages that included the following language: "you make me sick . . . I really don't like you . . . I want you to hurt and being f****** pain . . . I have so much hate for you" and "U think im playing u have no idea . . . how much I f******* hate you."

4

thoughts, and her anger toward Sanqui.[3] These emails further demonstrated that although appellant had started a relationship with another woman, she was merely pretending to be in love with that woman.

Jessica Escobar—the friend whom appellant said warned her about Sanqui's prior suicide attempt—denied in her testifimony that such an attempt had occurred or that she had told appellant so. Escobar further stated that she had observed no indication that Sanqui was depressed or suicidal. Sanqui's cousin, Francine Maher, denied that she had provided any drugs to Sanqui as appellant claimed. Maher further explained that while Sanqui had been sad about her mother's death, she did not seem clinically depressed, and Maher did not know Sanqui to abuse alcohol or prescription drugs. Sanqui's sister, Larizza Seng, testified that Sanqui had cut her hair short after breaking up with appellant because Sanqui preferred it short, whereas appellant had preferred she keep it long. Seng further stated that she did not know Sanqui to abuse alcohol or drugs and she saw no indication Sanqui was depressed or suicidal.[4]

Forensic pathologist Dr. Kathryn Pinneri testified that she performed an autopsy on Sanqui, and she concluded that the characteristics of the fatal bullet wound indicated that the gun had been pressed tightly against Sanqui's forehead at the time that the weapon was discharged. She further opined that such a wound was inconsistent with a struggle over the gun at the time of discharge because had there been a struggle, the gun would not have been placed so tightly against the forehead.

---

[3] Among other comments in the emails, appellant stated "this depression is completely taking me over," "I hate her the love I have is turning into something else my heart hurts soooo much I hurt so much . . . I have to morn her death because she is no longer that woman I married," and "if I could die I would . . . if I could commit suicide n still go to heaven I would do it in a heart beat. A life is not worth living if its not a life with her."

[4] As appellant points out, Escobar admitted that she did not know appellant kept a large number of dogs at her house and Maher acknowledged that she had never been to appellant's house.

Toxicology results from the autopsy were negative for the presence of alcohol in Sanqui's system, and Pinneri stated that she saw no indication during the autopsy that Sanqui abused alcohol or drugs.

The State additionally presented evidence that appellant's testimony regarding the handling of the handgun was not credible. Appellant stated that Sanqui cocked the gun, the gun discharged during a struggle, and appellant then placed the gun on the side of the bathtub without otherwise doing anything to it. The testimony of Raquel Pipkin, a firearms examiner with the Harris County Institute of Forensic Sciences, indicated that if the gun was handled as appellant described, the spent cartridge would have remained aligned with the barrel. However, crime scene investigator Deputy Mark McElvany testified that when he recovered the handgun, it contained two cartridges: a spent cartridge in the one o'clock position and a live round in the twelve o'clock position aligned with the barrel. According to Pipken's testimony, this could have occurred if the gun had been fired, re-cocked (thus turning the cylinder clockwise), de-cocked so that the hammer was down, and then placed in the location where McElvany found it on the edge of the bathtub. Pipken additionally noted that when the handgun was cocked, the space between the rear of the trigger and the trigger guard—where appellant asserted she stuck her finger— would have been approximately .147 inches wide and too narrow for an adult finger.

At the close of evidence, appellant requested that the jury be instructed on the defense of necessity. The trial court denied this request.

### *Sufficiency of the Evidence*

In her first issue, appellant challenges the sufficiency of the evidence to establish that she had the requisite mental state for murder. In assessing the sufficiency of the evidence to support a conviction, we must consider all of the evidence in the light most favorable to the verdict and determine whether, based on

that evidence and reasonable inferences therefrom, a rational trier of fact could have found the challenged element or elements of the crime beyond a reasonable doubt. *See Whatley v. State*, 445 S.W.3d 159, 166 (Tex. Crim. App. 2014); *see also Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979). In reviewing historical facts that support conflicting inferences, we presume that the jury resolved any conflicts in the State's favor and defer to that resolution. *Whatley*, 445 S.W.3d at 166. We do not sit as a thirteenth juror and may not substitute our judgment for that of the factfinder by reevaluating the weight and credibility of the evidence. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). As judge of the credibility of the witnesses, a jury may choose to believe all, some, or none of the testimony presented. *Cain v. State*, 958 S.W.2d 404, 407 n.5 (Tex. Crim. App. 1997).

Appellant was charged with murder under section 19.02(b) of the Texas Penal Code, which provides that "[a] person commits an offense if he: (1) intentionally or knowingly causes the death of an individual; [or] (2) intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual." Tex. Penal Code § 19.02(b). A person acts intentionally with respect to a result of her conduct when it is her conscious objective or desire to cause the result. Tex. Penal Code § 6.03(a); *Herrera v. State*, 367 S.W.3d 762, 770 (Tex. App.—Houston [14th Dist.] 2012, no pet.). A person acts knowingly with respect to a result of her conduct when she is aware her conduct is reasonably likely to cause the result. Tex. Penal Code § 6.03(b); *Herrera*, 367 S.W.3d at 770. Appellant asserts that the evidence does not support the jury's conclusion that she intentionally or knowingly caused Sanqui's death or intended to cause serious bodily injury and committed an act clearly dangerous to life that caused Sanqui's death.

Intent and knowledge are typically fact questions for the jury and are almost always proven through circumstantial evidence. *Childs v. State*, 21 S.W.3d 631, 635

7

(Tex. App.—Houston [14th Dist.] 2000, pet. ref'd). A jury may infer intent or knowledge from any facts that tend to prove their existence, including the acts, words, and conduct of the accused, the method of committing the offense, and the nature of the wounds inflicted on the victim. *See Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002); *Moore v. State*, 969 S.W.2d 4, 10 (Tex. Crim. App. 1996).

Circumstantial evidence is as probative as direct evidence and can be sufficient on its own to establish guilt. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). "In circumstantial evidence cases, it is not necessary that every fact and circumstance 'point directly and independently to the defendant's guilt; it is enough if the conclusion is warranted by the combined and cumulative force of all the incriminating circumstances.'" *Temple v. State*, 390 S.W.3d 341, 359-60 (Tex. Crim. App. 2013) (quoting *Johnson v. State*, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993)).

We begin our analysis of the evidence by noting that appellant admitted she was present at the time Sanqui sustained her fatal injury and appellant was involved—at least to some extent—in actions that resulted in Sanqui sustaining that injury. Appellant argues that the evidence demonstrated Sanqui committed suicide or died accidentally as they struggled over the handgun and does not support a finding beyond a reasonable doubt that appellant intentionally or knowingly caused Sanqui's death. Appellant's argument, however, is based almost entirely on her own statements and version of events. As stated, the jury was responsible for assessing appellant's credibility, and it was free to discount some or all of the evidence supporting her position.

As described above, much of appellant's testimony, as well as her statement to police on the night of Sanqui's death, was contradicted by other evidence a reasonable factfinder could have accepted. For example, appellant asserted that

Sanqui was having substantial difficulty overcoming the breakup of their marriage, but the text messages between the two of them and the emails appellant sent to herself on the days leading up to Sanqui's death revealed that it was appellant not Sanqui who was having difficulty with the breakup. Appellant testified that Sanqui had been suicidal and had attempted suicide in the past, but the text messages and emails showed that it was appellant, not Sanqui, who spoke of suicide, and the friend that appellant claimed told her about Sanqui's prior suicide denied that it happened or that she had told appellant about it.

Additionally, Sanqui's sister and cousin refuted appellant's claims that Sanqui had been depressed since her mother died and had been abusing alcohol and drugs. Medical records further discredited the notion that Sanqui had been abusing alcohol and drugs. Most critically, the pathologist who conducted Sanqui's autopsy explained why it was highly improbable, if not impossible, that Sanqui was shot during a struggle over a handgun. Also, the testimony of the firearms examiner suggested appellant was untruthful regarding how the handgun was handled. A rational trier of fact could have rejected appellant's statements on these matters. Moreover, false statements, inconsistent statements, and implausible explanations given to law enforcement are probative of wrongful conduct and often indicative of guilt. *See Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004) (holding defendant's false and inconsistent statements and implausible explanations were indicative of his complicity in the murder of his wife); *King v. State*, 29 S.W.3d 556, 565 (Tex. Crim. App. 2000) (concluding that defendant's false statements made after murder indicated "consciousness of guilt and an attempt to cover up the crime").

In finding beyond a reasonable doubt that appellant acted intentionally or knowingly, the jury also could have considered the threatening messages appellant sent to Sanqui as evidence of her guilt, including these messages sent just a few

hours before the fatal encounter: "you make me sick . . . I really don't like you . . . I want you to hurt and being f****** pain [sic] . . . I have so much hate for you" and "U think im playing u have no idea . . . how much I f******* hate you." *See, e.g., Ross v. State*, 133 S.W.3d 618, 621 (Tex. Crim. App. 2004). Appellant's texts expressing her desire for Sanqui to suffer pain support a finding that appellant at least intended to cause serious bodily injury. *See* Tex. Penal Code § 19.02(b)(2). Additionally, the jury could have concluded that the pathologist's testimony that the handgun was pressed tightly to Sanqui's forehead when it discharged was evidence that Sanqui's death was the result of an intentional or knowing act and not of an accidental discharge during a struggle.

Viewing all the evidence in the light most favorable to the verdict, we conclude that the jury could have rationally found beyond a reasonable doubt that appellant intentionally or knowingly caused Sanqui's death or intended to cause serious bodily injury and committed an act clearly dangerous to life that caused Sanqui's death. *See Whatley*, 445 S.W.3d at 166. Accordingly, we overrule appellant's first issue.

### *Instruction on Necessity*

In her second issue, appellant contends that the trial court erred in refusing to instruct the jury on the defense of necessity. A defendant is entitled to an instruction on a defensive issue if it is raised by the evidence, whether that evidence is strong or weak, unimpeached or contradicted, and regardless of whether the trial court considers the defense credible. *Walters v. State*, 247 S.W.3d 204, 209 (Tex. Crim. App. 2007); *Kenny v. State*, 292 S.W.3d 89, 100 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd). To raise a defensive issue, the evidence must raise each element of the defense. *E.g., Stefanoff v. State*, 78 S.W.3d 496, 499 (Tex. App.—Austin 2002, pet. ref'd). Evidence is sufficient to raise a defensive element when a rational juror

could accept it as sufficient to prove that element. *Id*. A defendant's testimony alone may be sufficient to raise a defensive issue. *Williams v. State*, 630 S.W.2d 640, 643 (Tex. Crim. App. 1982). When evidence from any source raises a defensive issue and the defendant properly requests a jury instruction or question on it, the trial court must submit the issue to the jury. *Muniz v. State*, 851 S.W.2d 238, 254 (Tex. Crim. App. 1993).

The Penal Code presents the defense of necessity as follows:

Conduct is justified if:

(1) the actor reasonably believes the conduct is immediately necessary to avoid imminent harm;

(2) the desirability and urgency of avoiding the harm clearly outweigh, according to ordinary standards of reasonableness, the harm sought to be prevented by the law proscribing the conduct; and

(3) a legislative purpose to exclude the justification claimed for the conduct does not otherwise plainly appear.

Tex. Penal Code § 9.22. The requirements of subsections 9.22(1) and (2) must be satisfied by evidence, while subsection (3) presents a question of law. *Pennington v. State*, 54 S.W.3d 852, 857 (Tex. App.—Fort Worth 2001, pet. ref'd). To be entitled to an instruction on necessity, a defendant must admit to the conduct—the act and the culpable mental state—of the offense charged. *Juarez v. State*, 308 S.W.3d 398, 399 (Tex. Crim. App. 2010).

As discussed in detail above, in this case, appellant has steadfastly denied both the conduct charged and the requisite mental state. To prove murder, the State was required to prove that appellant intentionally or knowingly caused Sanqui's death or intended to cause serious bodily injury and committed an act clearly dangerous to human life that caused Sanqui's death. *See* Tex. Penal Code § 19.02(b). Appellant maintained throughout trial that either Sanqui killed herself or the gun went off while

11

appellant was struggling with Sanqui in an attempt to get the gun away from her.

In her brief, appellant emphasizes her own testimony that she believed she had no choice but to try to get the handgun from Sanqui to prevent Sanqui from committing suicide; i.e., "[s]he believed it was necessary to attempt to grab the gun in order to prevent deathly harm to her wife." And this indeed was appellant's defense in a nutshell. But appellant did not testify or otherwise argue that she intentionally or knowingly caused Sanqui's death or intended to cause serious bodily injury and committed an act clearly dangerous to human life that caused Sanqui's death. She asserted that she was trying to prevent death or injury, not cause it. In other words, appellant did not admit to the conduct—the act or the culpable mental state—of the offense charged; she steadfastly denied the conduct. *See Juarez*, 308 S.W.3d at 399.

The necessity defense is simply inapplicable to the circumstances presented in this case. *See, e.g., Young v. State*, 991 S.W.2d 835, 839 (Tex. Crim. App. 1999) (holding defendant was not entitled to necessity instruction when he asserted he did not commit the offense charged because he did not have the requisite intent or perform the actions alleged). Accordingly, the trial court did not err in refusing to instruct the jury on necessity. We overrule appellant's second issue.

We affirm the trial court's judgment.


/s/    Jerry Zimmerer
Justice


Panel consists of Justices Wise, Jewell, and Zimmerer.
Do Not Publish — TEX. R. APP. P. 47.2(b).

12