

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-16-00416-CR

VENKATA SANIVARAPU                           APPELLANT

V.

THE STATE OF TEXAS                                STATE

----------

### FROM COUNTY CRIMINAL COURT NO. 1 OF DENTON COUNTY
### TRIAL COURT NO. CR-2016-05585-A

----------

## MEMORANDUM OPINION ON REHEARING[1]

----------

Appellant Venkata Sanivarapu filed a motion for rehearing of our original opinion that issued on March 15, 2018. We deny the motion, withdraw our opinion and judgment dated March 15, 2018, and substitute the following.

---

[1]*See* Tex. R. App. P. 47.4.

## I. Introduction

Sanivarapu appeals his conviction for assault-family violence. In four issues, Sanivarapu argues that the evidence is insufficient to demonstrate that he caused injuries to his wife, that the evidence is insufficient to demonstrate that he intended to harm her, that the evidence is insufficient to show the alleged manner and means as put forth in the State's charging instrument, and that the State failed to prove venue. We will affirm.

## II. Background

City of Denton Police Officer Roopak Nair testified that around 11:30 p.m. on December 29, 2015, he and another officer received a dispatch concerning a domestic disturbance occurring on the service road of Interstate 35 near West Oak Street in Denton. Specifically, Nair said that a 911 operator relayed to him that a male and female were seen fighting and that they had stopped their black SUV on the side of the roadway. According to Nair, City of Denton Police Officer Daniel Neighbors arrived at the scene just prior to his own arrival. Nair averred that when he arrived at the service road of Interstate 35 near West Oak, Neighbors had already located the stopped black SUV. Its hazard lights were blinking. Nair also said that as he arrived, Neighbors was already speaking with "an Indian male" and that "an Indian female" was standing near Neighbors's squad car. Per department policy, Nair turned on his body camera as he arrived.

Nair said that he immediately spoke with Neighbors, who briefed him on the situation, and that he then stayed with the male, later identified as

2

Sanivarapu, while Neighbors then spoke with the female, later identified as Sanivarapu's wife ("Wife"). Nair asked Sanivarapu what was going on. Initially, by Nair's account, Sanivarapu said nothing, but then he told Nair that he and Wife were "just having a discussion." Nair said that Neighbors shortly returned from speaking with Wife and detained Sanivarapu by placing handcuffs on him and seating him in the back of a squad car.

Nair then spoke with Wife. Nair described Wife as being "very hysterical" and said that her hysteria escalated when she saw Neighbors detaining Sanivarapu, so much so that Nair said he had to restrain her. At that time, Nair said that he observed dried and fresh blood on Wife's nostrils, on the right side of her forehead, toward her hairline, and in her right ear. He also observed what appeared to be a cut along her temple together with redness and swelling around her eye area and her cheek.

Nair asked Wife about the injuries, and Wife replied with two different stories that Nair said made no sense to him. Wife claimed first that the bleeding was because of it being cold outside. Wife claimed second that the blood was because of her having given birth to her daughter several months prior. Nair said that he called medics to come to the scene but that Wife declined treatment.

Nair photographed Wife's injuries as well as what appeared to be blood splatter near the passenger side doorframe of the SUV and the console. The State introduced and published these photographs to the jury. The State also introduced and played for the jury the video from Nair's body camera. In the

3

video, Neighbors can be heard explaining to Nair that Sanivarapu said that the reason the couple had stopped their SUV was because it was overheating but that Neighbors had established it was not. Sanivarapu can also be heard telling Nair that he and Wife were returning from a shopping outlet and on their way back to Irving, where the couple lived.

The video further shows Wife acting hysterically and explaining to Nair and Neighbors that her injuries were due to her having given birth to her daughter several months earlier and because it was cold outside. She can also be heard saying that she and Sanivarapu were "only talking." Wife can repeatedly be heard on the video saying that the officers cannot take her husband. Also in the video, Nair can be heard asking Wife why, if her bleeding was due to the cold, did she also have bruising on her face and forehead. Wife then changes her story about the injuries and appears to explain the injuries as being from the couple's two children. But later in the video, Wife maintains that her injuries were from having given birth to her daughter and her inability to stand in the cold without bleeding.

Later in the video, Nair and Neighbors can be seen and heard talking with two construction workers, one of whom had made the 911 call. Although neither of the workers said that they saw Sanivarapu physically strike Wife, they both described what they saw as a disturbing argument wherein Sanivarapu angrily yelled at Wife, left her standing on the side of the roadway in the cold and dark, allowed her to walk down an exit ramp, and then returned to yell at her again.

4

Still later in the video, Nair can be seen and heard questioning Sanivarapu. Sanivarapu can be heard stating that the couple was having an argument, that he was driving, and that he had told Wife to "shut up." Sanivarapu can also be heard stating that he "grabbed" Wife in an attempt to "shut her mouth up." Sanivarapu had no explanation as to why Wife was bleeding, but he admitted on camera that Wife was not bleeding before their argument. He can also be heard saying that whatever had happened, it was not "intentional" and that he was more focused on driving than what may have happened when he attempted to silence Wife as he drove down the road. Later, Sanivarapu wrote in a statement, "I used my right hand to stop [Wife] with no intention to harm but to address the safety concern."

On cross-examination, Nair stated that although he initially believed that an assault had been reported, he and Neighbors later learned that no assault had been reported and that the 911 caller had only reported an argument. On redirect, the State introduced photographs that Nair had taken of Sanivarapu at jail during booking. Two of the photographs show that Sanivarapu had some type of wound on his right wrist. Nair averred that Sanivarapu's right hand would have been the hand closest to Wife as he drove down the interstate.

Brandon Russell, the 911 caller, also testified at trial. Russell said that he was setting up traffic control signs on Interstate 35 on the night of these events and that just prior to 11:30 p.m., he noticed Wife standing on the side of the interstate. Russell said that this struck him as unusual given how dangerous it

5

would be to stand where she was standing at that time of night. He asked Wife if she needed help, to which Wife replied that she did not. By Russell's account, a few minutes later a vehicle with its hazard lights on was stopped next to Wife. After a coworker told Russell that Wife should not be standing where she was, Russell went over to her and told her it was dangerous to be there. Wife's response was to walk down the exit ramp to the service road. After Wife stood on the side of the service road for a bit, the same vehicle reappeared next to wife, but this time, Russell said that he could hear a man yelling at Wife. He described her as looking distraught.

From there, Russell called 911. In the audio of the call that the State played for the jury, Russell can be heard explaining to the 911 operator that Wife appeared to be in some sort of trouble and that the entire scene "didn't look right." Still in the 911 audio, Russell can further be heard describing how a black SUV came to a stop while Wife stood on the side of the interstate and then the SUV just drove away down the exit ramp. Russell continued to describe how he had told Wife it was not safe for her to stand where she was, how she walked down the exit ramp, and how moments later the SUV was again alongside Wife and a man was yelling at her from the SUV.

Russell averred that he later talked to the police when they arrived after he called 911. He also said that he never saw any physical altercation between the couple. He did state that he believed that Wife was outside the SUV against her will and that it seemed "like something was wrong."

6

The State called Wife to testify. Wife averred that on the day of Sanivarapu's arrest, the couple had gone to a casino and then to a shopping outlet in Gainesville to celebrate that they were closing on a new home. According to Wife, on the couple's drive back she talked to her brother on the phone and became upset because her brother was unable to attend rituals pertaining to the couple's new home and their infant daughter. Wife said that she was having this conversation as the couple drove through Denton. By Wife's account, she exited the vehicle on the highway because Sanivarapu had lost his glasses while looking for a phone charger. She further said that because the exit from the highway was only fifty meters from where she stood, and because Sanivarapu was still having a problem finding his glasses, he exited the interstate by driving and she followed on foot. Wife averred that shortly after walking down the ramp, she went back into the vehicle to assist Sanivarapu in finding his glasses and that "during that point of time, probably [she] had cut [herself] . . . [on] an air freshener." Wife said that she was unaware of any injuries at that time and that from there she continued her conversation with her brother. Wife also testified that she did not have any other injuries on that night, other than a possible cut on her head caused by the air freshener, and that the redness and swelling that the officers observed was due to either her acne or possibly remnants of her having previously suffered a bout of shingles.

According to Wife, she made up the story of the SUV overheating because she wanted to avoid any conversation with the police in hopes of getting home to

7

her daughter as soon as possible.  She also recalled telling the officers that her ear was bleeding because of the cold.  As Wife explained it, "[t]hat's [her] body['s] nature" and is a condition she has had her entire life.  She also attributed the presence of blood in her nostrils to this same condition.  Wife further recalled telling the officers that the redness and swelling on her face was because of her children playing rough with her, but she said that she said that because she was unaware of any redness and swelling and was trying to explain what the officers said they were seeing.

Wife agreed that she had written a letter days after Sanivarapu's arrest describing how he had used his right hand to "calm [her] down" so that she would not overreact to her brother telling her he would not be coming because Sanivarapu needed to focus on driving.  While Wife agreed that Sanivarapu made "contact" with her face by use of his right hand in attempts to calm her down, she said that he never hit, pulled, or struck her that evening.  Wife had no explanation for the presence of blood splatter on the passenger's side doorframe.

Officer Neighbors testified that he received a dispatch just prior to 11:30 p.m. on December 29 concerning a man and a woman fighting in the street.  Neighbors said that he was the first to arrive at the scene and that he later learned that the 911 caller had not seen an actual physical altercation.  By Neighbors's account, when he arrived, Sanivarapu was seated in the SUV as it was parked on the side of the service road and Wife was standing outside the vehicle on the side of the service road.  The two were arguing.  As Neighbors

8

approached the SUV, he asked what was going on between the couple. Neighbors averred that the couple told him that the car was overheating but that he looked at the temperature gauge and it was not.

Neighbors said that Sanivarapu acted nervous and that he observed blood on Sanivarapu's knuckles. Neighbors described the blood as being embedded in the skin and typical of the blood marks that happen to a person's hand when they punch someone. Neighbors asked Sanivarapu about the blood, and according to Neighbors, Sanivarapu insisted that it was not blood and then wiped the blood from his knuckles.

At the same time, Neighbors observed Wife lean into the SUV and noticed that Wife had blood in her ear and coming out of her nose. Neighbors said that she also "had quite a few [other] injuries." Neighbors then asked Wife to step away from the SUV and to the front of his squad car, where he was able to see the injuries more clearly. When Neighbors asked her how she sustained the injuries, Wife said that she had a bleeding disorder and that she had recently given birth to her daughter. Notably, Neighbors said that Wife never said anything about Sanivarapu looking for his glasses as the reason for pulling to the side of the interstate. She also never mentioned that she suffered from acne or that she had scars and redness from having had shingles. Video from Neighbors's body camera, which was published to the jury, confirms his account of what transpired once he arrived on the scene.

9

Neighbors averred that in his eight years of duty, he had responded to more than 1,000 domestic-violence situations. Based on his experience, and given what Neighbors described as typical behavior of a domestic-violence victim by Wife, he surmised that her injuries were caused by Sanivarapu, so Neighbors made the decision to arrest him.

Venkata Sridhar Bhuvanagiri (Sridhar) testified for the defense. Sridhar said that he has known Sanivarapu since 2006, when the two worked together in India. Wife is Sridhar's sister, and Sanivarapu met Wife through his friendship with Sridhar. Sridhar described Sanivarapu as "a very good person, a very good human being." He also said that Sanivarapu is a caring husband who loves Wife very much. According to Sridhar, he has never seen the couple have a disagreement.

Sridhar said that he called Sanivarapu on the night of these events to tell him he would be unable to attend the rituals related to the house closing and his niece. Sridhar described Sanivarapu as calm and understanding. He next spoke with Wife, and he described her as "upset" and said that she began to yell at him for not being able to make it to the house closing party. Sridhar said that he could hear Sanivarapu telling wife to "shut up" and to "calm down." Sridhar said that he never heard any sounds of a physical altercation. He further said that if Sanivarapu had physically abused Wife, she would have told Sridhar.

The jury found Sanivarapu guilty of assault-family violence, and after the punishment phase, the jury assessed punishment at one year in jail with a

10

recommendation that the trial court suspend imposition of the sentence and place Sanivarapu on community supervision. The trial court suspended the imposition of the sentence and placed Sanivarapu on two years' community supervision. This appeal followed.

### III. Discussion

### A. Sufficiency of the Evidence

In his first, second, and fourth issues, Sanivarapu argues that the evidence is insufficient to demonstrate that he was the cause of Wife's injuries, that the evidence is insufficient to show that he had the culpable mental state to commit the alleged assault, and that the evidence is insufficient to prove the manner and means of an assault as alleged in the information. We disagree.

### 1. Standard of Review

In our due-process review of the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016). This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Jenkins*, 493 S.W.3d at 599.

The trier of fact is the sole judge of the weight and credibility of the evidence. *See* Tex. Code Crim. Proc. Ann. art. 38.04 (West 1979); *Blea v. State*, 483 S.W.3d 29, 33 (Tex. Crim. App. 2016). Thus, when performing an evidentiary sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder. *See Montgomery v. State*, 369 S.W.3d 188, 192 (Tex. Crim. App. 2012). Instead, we determine whether the necessary inferences are reasonable based upon the cumulative force of the evidence when viewed in the light most favorable to the verdict. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App.), *cert. denied*, 136 S. Ct. 198 (2015). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict and defer to that resolution. *Id.* at 448–49; *see Blea*, 483 S.W.3d at 33.

To determine whether the State has met its burden under *Jackson* to prove a defendant's guilt beyond a reasonable doubt, we compare the elements of the crime as defined by the hypothetically correct jury charge to the evidence adduced at trial. *See Jenkins*, 493 S.W.3d at 599; *Crabtree v. State*, 389 S.W.3d 820, 824 (Tex. Crim. App. 2012) ("The essential elements of the crime are determined by state law."). Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Jenkins*, 493 S.W.3d at 599. The law as authorized by the indictment means the statutory

12

elements of the charged offense as modified by the factual details and legal theories contained in the charging instrument. *See id*.; *see also Rabb v. State*, 434 S.W.3d 613, 616 (Tex. Crim. App. 2014) ("When the State pleads a specific element of a penal offense that has statutory alternatives for that element, the sufficiency of the evidence will be measured by the element that was actually pleaded, and not any alternative statutory elements.").

The standard of review is the same for direct and circumstantial evidence cases; circumstantial evidence is as probative as direct evidence in establishing guilt. *Jenkins*, 493 S.W.3d at 599.

## 2. Assault-Family Violence and Culpable Mental State

To establish that Sanivarapu committed the offense of assault on a family member, as alleged in the information, the State was required to prove that he intentionally or knowingly caused bodily injury to Wife, a member of his family or household, by pushing, pulling, or striking her with his hand. *See* Tex. Penal Code Ann. § 22.01(a)(1) (West Supp. 2017). Assault by causing bodily injury is a "result-oriented" offense. *Darkins v. State*, 430 S.W.3d 559, 565 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd). Thus, the State must prove that the defendant caused the result—i.e., caused bodily injury to the complainant—with the requisite culpable mental state. *Id.* A person acts intentionally, or with intent, with respect to a result of his conduct when it is his conscious objective or desire to cause the result. Tex. Penal Code Ann. § 6.03(a) (West 2011). A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is

13

aware that his conduct is reasonably certain to cause the result. *Id.* § 6.03(b). The Penal Code defines "bodily injury" as "physical pain, illness, or any impairment of physical condition." *Id.* § 1.07(8) (West Supp. 2017).

Direct evidence of the requisite culpable mental state is not required. *See Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002); *Tottenham v. State*, 285 S.W.3d 19, 28 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd) ("[P]roof of a culpable mental state almost invariably depends on circumstantial evidence."). A defendant's culpable mental state can be inferred from his acts, words, and conduct. *Patrick v. State*, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995), *cert. denied*, 517 U.S. 1106 (1996); *see Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004) ("Intent may also be inferred from circumstantial evidence such as acts, words, and the conduct of the appellant."). The requisite culpable mental state may also be inferred from the extent of injuries to the complainant, the method used to produce the injuries, and the relative size and strength of the parties. *Herrera v. State*, 367 S.W.3d 762, 771 (Tex. App.—Houston [14th Dist.] 2012, no pet.) (*citing Patrick*, 906 S.W.2d at 487); *see also Hart*, 89 S.W.3d at 64 (stating that intent and knowledge may be inferred from "any facts which tend to prove its existence, including the acts, words, and conduct of the accused, and the method of committing the crime and from the nature of wounds inflicted on the victims.") (quoting *Manrique v. State*, 994 S.W.2d 640, 649 (Tex. Crim. App. 1999).

### 3. The Evidence Supports the Jury's Verdict

Viewing the evidence in a light most favorable to the jury's verdict, and taking all reasonable inferences from that evidence, a rational factfinder could have found that Sanivarapu intentionally or knowingly caused the injuries that both Nair and Neighbors observed and that Nair photographed on Wife once they arrived at the scene. Indeed, Nair and Neighbors both testified that Wife had extensive injuries to her face, including a cut next to her temple and redness and swelling on her cheek. The officers also described how Wife had blood in her nostrils and in her ear in various states of freshness. Neighbors testified that Sanivarapu had blood on his knuckles when Neighbors first arrived, and Neighbors said that after claiming not to be able to explain why he had blood on his knuckles, Sanivarapu wiped the blood from his hand. The jury could have found that Sanivarapu's attempts to clean the blood from his hand demonstrated a consciousness of guilt. *See Johnson v. State*, 583 S.W.2d 399, 409 (Tex. Crim. App. [Panel Op.] 1979) (reasoning that attempts to conceal evidence of a crime demonstrate a consciousness of guilt). And it is a reasonable inference from the evidence that the blood on Sanivarapu's knuckles was blood from him having struck Wife with his hand. In fact, Neighbors testified that the state of the blood on Sanivarapu's knuckles was consistent with him having struck another person.

15

Moreover, the officers were responding to a 911 dispatch that described a couple arguing on the interstate and that Wife was outside of the vehicle in dangerous proximity to traffic. Then later, after Wife walked down the exit ramp in the cold and dark, Sanivarapu drove up alongside her and again began to yell at her as she stood outside the couple's SUV. Once the officers had arrived and were questioning Sanivarapu regarding Wife's injuries, he claimed that he had used his hand in an attempt to "shut up" Wife, and Wife testified at trial that Sanivarapu had made contact with his hand to her mouth. A reasonable inference from this evidence, especially when considering the extensive injuries to Wife's face, nose, and ear, is that Sanivarapu had done more than made mere contact with his hand to her mouth but instead had caused the injuries by striking, pushing, or pulling wife's head and face with his hand.

Furthermore, when the officers arrived, both Sanivarapu and Wife fabricated a story that their SUV had overheated, which Neighbors confirmed was not true, and Wife testified at trial that they had made up the story in order to avoid having to talk to the police. The jury could have inferred a consciousness of guilt because of this fabricated story. *See Cuong Quoc Ly v. State*, 273 S.W.3d 778, 782 (Tex. App.—Houston [14th Dist.] 2008, pet. ref'd) (reasoning that the making of false statements can be evidence of a consciousness of guilt).

The jury was also free to disbelieve Wife's explanations that her injuries were due to her own body's reaction to the cold, to having given birth to her daughter several months prior, to her children having been rough with her, and to

16

her having hit her head on an air freshener as she looked for Sanivarapu's glasses (an explanation that she never mentioned to either officer as the reason the couple had pulled over and did not proffer until after Sanivarapu was charged). Indeed, video from both Nair's and Neighbors's body cameras show that Wife stood for a lengthy amount of time out in the cold but that Wife's ears and nose did not again begin to bleed more; and the jury saw photographs of the air freshener that Wife surmised might have caused her injuries, an air freshener that did not have blood on it and one the jury was free to believe had not caused the multiple injuries that Wife sustained. And the jury was free to disbelieve Wife's testimony at trial that her face was red from acne and previously having had shingles, explanations that Wife again did not proffer to the officers when they questioned her at the scene specifically about the redness and swollenness of her face and cheek.

As to Sanivarapu's culpable mental state, the jury could have inferred from his and Wife's lack of plausible explanations for her injuries, their fabricating of a story about the SUV having overheated, the bizarre episode of Wife standing on the side of the interstate and then walking down the exit ramp in the cold and dark only to have Sanivarapu drive again beside her and yell at her, and the extent of Wife's injuries as demonstrative that Sanivarapu intentionally or knowingly caused the injuries to Wife. *See Montgomery v. State*, 198 S.W.3d 67, 87–88 (Tex. App.—Fort Worth 2006, pet. ref'd) (taking into account the nature

17

and extent of injuries in determining that sufficient evidence existed that defendant knowingly caused complainant's injuries).

As to whether the State proved the manner and means that the State charged, specifically that Sanivarapu caused Wife's injuries by "pushing or pulling or striking" Wife with his hand, the manner and means of injuries alleged in an assault case are "not an essential element of the offense and therefore [are] not included within the hypothetically correct jury charge," and thus they are not challengeable under a sufficiency-of-the-evidence review. *Thomas v. State*, 303 S.W.3d 331, 333 (Tex. App.—El Paso 2009, no pet.); *see also Karl v. State*, No. 02-16-00001-CR, 2016 WL 5443116, at *5–8 (Tex. App.—Fort Worth Sept. 29, 2016, no pet.) (mem. op., not designated for publication) ("Recently, we held that in an assaultive offense, the manner and means of causing a victim's injury are not essential elements of an offense that are required to be included in a hypothetically correct jury charge.").

We conclude and hold that a rational factfinder could have found that Sanivarapu committed the offense of assault on a family member, as charged in the information, by having the conscious objective to, or by being aware that his conduct was reasonably certain to, cause injury to Wife. *See Jenkins*, 493 S.W.3d at 599; *Crabtree*, 389 S.W.3d at 824. We overrule Sanivarapu's first, second, and fourth issues.

**B.    Venue**

In his third issue, Sanivarapu argues that the State failed to prove venue. Specifically, Sanivarapu argues that the State failed to prove that he assaulted Wife in Denton County.  At trial, Sanivarapu did not complain about venue until he moved for a directed verdict.  Assuming without deciding that moving for a directed verdict on the grounds that venue has not been proven is enough to preserve this issue for appeal, the State proved venue by a preponderance of the evidence.  *See Thompson v. State*, 244 S.W.3d 357, 362 (Tex. App.—Tyler 2006, pet. dism'd) (holding that moving for directed verdict that venue has not been established preserves the issue for appeal).

Venue is proper in the county where the offense occurred.  *See* Tex. Code Crim. Proc. Ann. art. 13.18 (West 2015).  Because venue is not considered an element of an offense, it need only be proven by a preponderance of the evidence.  *See id.* art. 13.17 (West 2015); *Fairfield v. State*, 610 S.W.2d 771, 779 (Tex. Crim. App. [Panel Op.] 1981); *Williams v. State*, 356 S.W.3d 508, 518 (Tex. App.—Texarkana 2011, pet. ref'd).  Proof of venue may be by direct or circumstantial evidence, and the factfinder may make reasonable inferences from the evidence.  *Couchman v. State*, 3 S.W.3d 155, 161 (Tex. App.—Fort Worth 1999, pet. ref'd).

When reviewing venue, we view all of the evidence in the light most favorable to an affirmative venue finding and ask whether any rational factfinder could have found by a preponderance of the evidence that venue was proved.

*Williams*, 356 S.W.3d at 518; *Vanschoyck v. State*, 189 S.W.3d 333, 336 (Tex. App.—Texarkana 2006, pet. ref'd.).

Here, viewing the evidence in the light most favorable to the jury's affirmative finding that Sanivarapu committed this offense in Denton County, the record supports that the jury could have found by a preponderance of the evidence that venue was proved. The record demonstrates that witnesses observed Wife and Sanivarapu arguing while Sanivarapu was in the couple's SUV and Wife was standing dangerously on the side of Interstate 35 in Denton County. Specifically, the witnesses described the argument as one-sided wherein Sanivarapu was yelling at Wife. A reasonable inference from this evidence is that Sanivarapu stopped the SUV during the time, immediately prior to the time, or immediately after the time that he was assaulting her and that this physical altercation is why she exited the SUV in such a precarious place and why she walked down the exit ramp in the dark rather than getting back into the SUV. These same witnesses described how after Wife walked down the exit ramp, Sanivarapu circled back around so that he could yell at Wife again. A reasonable inference from this evidence is that Sanivarapu was still presently angry with Wife, and thus it is reasonable to infer that Sanivarapu had recently struck Wife in anger and that enough time had not passed for him to calm down, inferring that the couple's altercation was very recent. Furthermore, Nair described how when he first made contact with Wife, he observed dried and fresh blood on Wife's nostrils, on the right side of her forehead, toward her

20

hairline, and in her right ear. A reasonable inference from the fact that wife had fresh blood on her is that she had been struck very recently. We hold that a rational factfinder could have found by a preponderance of the evidence that Sanivarapu struck Wife in Denton County and thus properly made an affirmative finding that Denton County was the proper venue. *See Williams*, 356 S.W.3d at 518. We overrule Sanivarapu's third issue.

## IV. Conclusion

Having overruled all four of Sanivarapu's issues on appeal, we affirm the trial court's judgment.

/s/ Bill Meier
BILL MEIER
JUSTICE

PANEL: WALKER, MEIER, and GABRIEL, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: July 26, 2018