

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

————————————————————

No. 02-17-00409-CR

————————————————————

JASON BERNARD ALLEN, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from the 297th District Court
Tarrant County, Texas
Trial Court No. 1454387D

---

Before Kerr, Birdwell, and Womack, JJ.
Memorandum Opinion by Justice Womack

## MEMORANDUM OPINION[1]

### I. INTRODUCTION

Appellant Jason Bernard Allen appeals his conviction for murder while using a deadly weapon—a firearm. In three points, Allen challenges (1) the sufficiency of the identification evidence, (2) the trial court's admission of cellular data, and (3) the trial court's admission of the testimony of a deputy medical examiner. We affirm.

### II. BACKGROUND

This case involves the murder of Dannie Neal, who was shot to death on February 29, 2016, at the intersection of Georgetown Drive and Peppermill Lane in Everman. The State's case, which included seventeen witnesses and seventy-one exhibits, focused on Allen, who pleaded not guilty to the State's charge of murder while using a deadly weapon. This case went to a jury trial.

#### A. Sherry Thomas

At trial, Sherry Thomas testified that she lives on a corner lot at the intersection where the shooting occurred. According to Thomas, on the night of February 29, she saw a large Penske moving truck parked outside her dining room window and was curious why it was parked there. Thomas said that when she took a closer look, she

---

[1]This case was originally assigned to a panel consisting of Justices Pittman, Kerr, and Birdwell. After Justice Pittman was sworn in to serve as United States District Judge for the Northern District of Texas, this case was submitted on briefs on August 27, 2019, to a new panel consisting of Justices Kerr, Birdwell, and Womack. *See* Tex. R. App. P. 39.8, 41.1(a)–(b).

saw a man, later identified as Neal, lying in the street. And then she saw a young man get out of his car with a handgun, fire shots toward the ground, get back in his car, and drive away. As Thomas testified, the State introduced photographs of Thomas's house and the nearby intersection on an overhead projector. Thomas then used a laser pointer to show her proximity to the shooting she observed.

Thomas averred that she was not sure of the color of the car that the shooter had driven away in, but she thought that it may have been brownish or tannish in color. But Thomas explained that she was mainly focused on the shooter's handgun, that she was not wearing her glasses, and that the only thing she could truly see "was a fire coming out of the gun." She was able to describe the shooter as "African-American" and tall enough for her to have to look up to—Thomas is five-foot-three. Thomas recalled that shortly after the shooter drove away, another vehicle pulled up and a man, later identified as Anton King, got out of the vehicle and held Neal's body until police arrived. Thomas said that she only "saw one person," the shooter, get in or out of the car that drove away after the shooting, but she admitted that she was not really looking inside the car.

## B. Charles Rappa

Charles Rappa testified that he was also living in one of the houses located on a corner of the intersection where the shooting occurred. Rappa stated that he and other family members were inside his house eating dinner the evening of February 29 when he heard "loud pops [that] sounded like [] gunshots." Rappa averred that he

3

and family members went to see what was happening; across the street he saw a yellow Penske truck and a "silverish-gray" or "silver" car that he described as an "older model car" with "big chrome wheels on it." Rappa said that the car was a large vehicle in the style of a "Monte Carlo" or "Cadillac." Rappa recalled that he was somewhere between 50 and 100 feet from the intersection when he saw Neal fall in the street and another man standing over him.

Rappa did not remember seeing any gunshots, but he did say that the driver of the car stood over Neal for a moment and then got back in and sped away. Rappa described the driver of the vehicle as an African-American male who was "[m]aybe five-foot -- between five-seven, five-eight, kind of general area." Rappa could not recall seeing anyone else in the car.

Rappa said that he and his girlfriend went to check on Neal, that Neal was barely breathing, that he told Neal that help was on its way, and that an SUV quickly drove toward Neal and came to a screeching halt. Rappa and his girlfriend immediately fled back into his house.

After returning to his house, Rappa averred that he went next door because the person living there was a police officer. Rappa recalled seeing King embrace Neal and declare, "They got you, man, they got you." Similar to when Thomas testified, Rappa utilized a laser pointer and an image the State had published on a screen to describe the distance between where he was when the shooting began and where the Penske truck and the assailant's vehicle were as the events unfolded.

4

By Rappa's account, the police arrived shortly after King did. Rappa recalled how the police were there for a couple of hours, and Rappa stayed until they had left.

## C. James Whitaker

James Whitaker testified for the State as well. Whitaker said that he too lived near where the shooting occurred and that his house had nine outdoor surveillance cameras. According to Whitaker, after hearing four to five gunshots, he stepped outside and looked toward the intersection and saw the Penske truck and another vehicle. He then observed a man get into the other vehicle and speed away. Whitaker could describe the man getting into the vehicle only as "black," unable to recall a better description.

By Whitaker's account, police and emergency vehicles soon arrived, and he went outside to speak with police. As he approached the scene, Whitaker could see that someone had been shot and was probably dead. Whitaker said that he then informed the police of his surveillance cameras and that he provided them with access to captured video of the shooting. As the State played video from that evening, Whitaker described to the jury what they were seeing. Whitaker described how the video showed multiple gunshots coming from inside of a "dark-colored car" that "wasn't a big car" stationed near the Penske truck. He then described the shots the video showed that occurred outside of the vehicle.

## D.  Anton King

King testified that he had been one of Neal's best friends for several years. King said that Neal had recently launched his own moving business in Atlanta but that Neal had several family members that lived in the DFW area, including twin daughters.  According to King, Neal often stayed with King when Neal was in town, and King lived only two blocks from the intersection where Neal was murdered. King said that he spoke with Neal the afternoon of February 29 when Neal was at a Chuck E. Cheese's with his twin daughters and their mother—Tyneshie.  By King's account, Neal was having "problems" with Tyneshie's husband, Allen.  Specifically, King averred that Allen did not want Neal around and that Allen wanted Neal to relinquish his parental rights to the twins.

According to King, Neal planned to come stay with him after he finished visiting his daughters at Chuck E. Cheese's, and King called Neal after Neal had left the restaurant and was heading toward King's house.  While King was on the phone with Neal, Neal told King that someone was following him in a "gray Grand Marquis or a gray Crown Vic, a gray-silver kind of car."  Neal told King that his "baby mother's husband (Allen)" was the person following him and that he knew this because Tyneshie had called him and told him that Allen was following him.  Neal also told King that Tyneshie said that Allen was alone.  King testified that Neal explained how Allen had been following him for more than twenty minutes and that Neal became increasingly upset about it.  King stated that Neal insisted on stopping to

6

confront Allen, even though King had tried to convince Neal not to do so. According to King, despite his pleas to Neal, Neal told him that he was pulling over and getting out of his truck to find out why Allen was following him.

King recalled that he heard Neal open his truck's door and then he heard some "commotion," but he became distracted by his children and had to pull the phone away from his ear for a moment. King said that when he returned the phone to his ear, he could hear Neal's dog barking, so he went to find Neal. By King's account, moments later and only a few blocks away, he saw Neal lying on the ground near the Penske truck with a couple standing nearby. King said that he jumped out of his vehicle and rushed toward Neal, who was still breathing. King stated that the couple ran away and that within minutes the police arrived.

King averred that he did not know that Neal had been shot until the police arrived and told him that someone had reported gunshots. King then lifted Neal's shirt and saw the gunshot wounds. Neal died in King's arms. King said that he remained on scene, spoke with multiple officers, and signed a written statement.

### E. Officer James Thompson

Officer James Thompson from the City of Everman Police Department testified that he responded to the shooting that night. Thompson said that several people had gathered around the scene prior to his arrival and that he taped off the scene once he arrived. Thompson averred that two other officers from a neighboring municipality also arrived on scene shortly after he got there. According to

7

Thompson, he retrieved surveillance video from Whitaker's home that night, and he spoke with Whitaker. Thompson recalled that Whitaker described the shooter's vehicle as being black in color, but Thompson said that he could not make out the model of the vehicle from the video. Thompson testified that the next day, the Texas Rangers became involved in the investigation.

## F. Lorelei Peterson

Lorelei Peterson, a forensic scientist with the Fort Worth Police Department, testified that she photographed the crime scene. As the State introduced these photographs, Peterson described for the jury what they were seeing, including the general crime scene, Neal's body as it laid on the ground, and the injuries he had sustained. Peterson also found and photographed a spent bullet at the crime scene, and she testified that she collected the bullet.

## G. Dr. Tasha Greenberg

The State called deputy medical examiner Dr. Tasha Greenberg from the Tarrant County Medical Examiner's Office. Greenberg testified that although she did not perform the autopsy on Neal, she had examined the autopsy report and photographs and had formed her own opinion as to the cause of Neal's death. Using a "Poser diagram," Greenberg described the wounds that Neal suffered the night of the shooting. According to Greenberg, among other injuries, Neal had gunshot wounds to his left forehead and between his eyebrows, either of which Greenberg said could have been fatal. Neal also had gunshot wounds to his upper-left abdomen

8

and mid-back area, which Greenberg again said either of which could have been fatal. Greenberg also described a fifth, non-fatal wound where the bullet had passed through Neal's body, which Greenberg said was consistent with the spent bullet that was found by Peterson. Greenberg said that in her opinion, Neal had died from multiple gunshot wounds, and she deemed his manner of death a homicide.

On cross-examination, Greenberg explained that even though she had signed-off on the initial report, the autopsy in this case had been amended by another doctor prior to trial. Specifically, Greenberg said that the original doctor who performed the autopsy changed findings regarding the range at which the gunshot wounds occurred. Greenberg averred that she agreed with the amended report, but she also said that she herself had never had to amend a report. She agreed that the autopsy did not reveal any defensive wounds and that Neal tested positive for THC and cocaine.

## H. Texas Ranger Ike Upshaw

Texas Ranger Ike Upshaw testified that he investigated Neal's murder. According to Upshaw, Allen was a suspect from the very beginning because Allen's name had appeared in reports made by the initial responding officers. Upshaw said that through video surveillance footage gathered from Chuck E. Cheese's and multiple convenience stores, he was able to trace Neal's path of driving from the restaurant to the murder scene. Upshaw averred that tracing Neal's path was not difficult because the size and color of his Penske truck made it easy to locate on video. In order to verify how long it would have taken Neal to drive to Everman,

Upshaw described how he had personally driven from Chuck E. Cheese's in Grand Prairie by driving west on I-20 for roughly nineteen minutes and then exiting near Forest Hill Drive. Upshaw also said that either he or his forensic video analyst had recovered surveillance footage from a 7-Eleven and a Valero, both convenience stores in Everman near the murder site.

After determining that Allen owned a 2005 gold-colored Mercury Grand Marquis at the time of the murder, Upshaw was able to identify a gold-colored Mercury Grand Marquis leaving Chuck E. Cheese's at the same time as Neal. He also said he saw a "vehicle similar in size and make passing directly behind the Penske truck" via surveillance footage from the 7-Eleven and Valero. Utilizing a laser pointer and a demonstrative map, Upshaw explained to the jury the locations of the 7-Eleven and Valero where the videos had been obtained. The map suggests that whoever was driving the vehicle identified in the videos followed Neal from Chuck E. Cheese's to the intersection where he was murdered.

Upshaw stated that he next looked for Allen's Mercury Grand Marquis and found it at a used auto dealership—VP Auto Sales. Upshaw sent the car for testing. Upshaw said that he obtained a warrant for Allen's arrest based on the results of the testing, information gathered from witnesses, and an analysis of Neal's and Allen's cell phone data from the night of the murder.

On cross-examination, Upshaw averred that one of the on-scene witnesses described the shooter as being six-feet tall. He also said that he knew that, according

10

to Allen's driver's license, Allen was roughly five-foot-two. He also detailed that there were at least three or four different descriptions given by witnesses describing the color of the shooter's car. According to Upshaw, the description of the vehicle ranged from a Chevrolet Impala to a "Crown-Victoria-type vehicle," and the color was described by witnesses as anywhere from silver to brown. He further testified that at least one witness's description of the vehicle included that the car had chrome rims, but that the Mercury Grand Marquis Upshaw located at the dealership did not have chrome rims.

## I. Kelly Walker

The State called Kelly Walker, a records custodian for Sprint, who authenticated cell-tower data for Neal's, Allen's, Tyneshie's, and King's phones from February 29. Walker said that the data showed that someone using King's phone had called Neal's number at roughly 7 p.m. that night. The call lasted just under four minutes. The data also showed that Tyneshie had called and left Neal a voicemail at roughly the same time.

## J. Chris Ledbetter

Chris Ledbetter of the Texas Department of Public Safety (DPS) testified that he typically analyzes digital forensics for cell phones and computers and that he had extracted data from Neal's phone in this case. In addition to discussing numerous text messages between Neal and Tyneshie prior to them meeting at Chuck E. Cheese's, Ledbetter read texts from Tyneshie to Neal that were made at 7:30 p.m. and

11

7:49 p.m. In these texts, Tyneshie asked Neal if he was okay and to let her know that he was okay. Ledbetter also averred that Tyneshie called Neal at 6:57 p.m. and 7:18 p.m. and that the data showed missed calls from Tyneshie to Neal at 7:45 p.m., 7:47 p.m., and 9:35 p.m. Ledbetter said that the data further revealed that Tyneshie had also sent a naked picture of herself to Neal on April 3, 2015.

## K. Zach Smith

Zach Smith, an inventory manager for VP Auto Sales, testified that Allen purchased a 2005 Mercury Grand Marquis from his dealership in August 2015. According to Smith, Allen's account showed that he had made all required payments on the vehicle until he returned the vehicle to VP Auto Sales "voluntarily" on March 1, 2016—the day after Neal's murder.[2] Because the Texas Rangers had previously asked Smith to keep an eye out for the vehicle, he contacted them as soon as he knew the car had been returned to the dealership, and Smith directed that no one at the dealership touch the vehicle. Smith said that it was "[v]ery, very odd" that someone whose account was in good standing would voluntarily allow the dealership to repossess his vehicle. As Smith testified, the State introduced a finance ledger that Smith averred showed that Allen had always made his payments timely since August 2015 and that his most recent payment had been made on February 27, 2016.

---

[2]Smith testified that he did not see Allen the day he dropped off the vehicle, but Smith said that he was notified that Allen had dropped off the vehicle in person.

12

Eventually, Upshaw went to the dealership and picked up the Mercury Grand Marquis that Allen had returned.

## L.  Josh Khaemba

A night-shift manager for M3 Glass Technologies (M3), Josh Khaemba, also testified for the State.  By Khaemba's account, Allen was working for M3 on February 29, 2016; Allen had clocked in at 4:16 p.m., but he came to Khaemba and said that he needed to leave for a family emergency.  Records indicate that Allen clocked out at 6:05 p.m.

## M.  Tyneshie Allen

The State subpoenaed Tyneshie to testify at trial.  Tyneshie said that she had been in a relationship with Allen when she was in high school but that she had lost contact with him for several years.  According to Tyneshie, during the time after she lost contact with Allen, she met Neal.  Tyneshie said that she and Neal were never really in a relationship, but that in August of 2009, she gave birth to her and Neal's twin daughters.  Later, in September of 2013, Tyneshie married Allen.

Tyneshie averred that Neal was not heavily involved in their daughters' lives, but that Neal had begun to see them more regularly prior to his murder.  Tyneshie said that she and Allen were having marital struggles during the months leading up to Neal's murder—in February 2016, she had asked Allen for a separation, but the couple continued to live in the same house.  By Tyneshie's account, even though she had sent Neal a naked picture of herself, she was not romantically or sexually involved

13

with Neal after she married Allen, but she admitted to thinking about having a relationship with him. Tyneshie testified that just prior to Neal's murder, Allen drove a "goldish-brown" Mercury Grand Marquis.

Tyneshie recalled how she had arranged to meet Neal at Chuck E. Cheese's in Grand Prairie on February 29. Tyneshie said that Neal met her and the girls at the restaurant and that he arrived in a big, yellow truck. According to Tyneshie, she did not tell Allen that she was meeting Neal that day because the two were not on speaking terms. But in later testimony, she said that Allen knew that she was meeting Neal, although he did not know where they were meeting. Tyneshie said that after Neal left the restaurant, he immediately called her[3] and told her that someone was following him. Although she was initially concerned, Tyneshie stated that she became very nervous once she was no longer able to contact Neal by phone.

Tyneshie said that later that night she received a call from a detective, but because she did not recognize the number she did not answer. Tyneshie averred that she learned that Neal had been killed the next morning from Neal's sister. Tyneshie stated that when she first heard of Neal's death, she did not think that Allen was involved, but she also stated that Neal's sister told her during the same conversation where she learned of his death that Allen was a suspect. She said that she was unaware at the time that Allen had left work early the night before and that she only

_____

[3]At one point, Tyneshie stated that Neal had called her but at another point in her testimony, she said that she was the one who called him.

found out later. Tyneshie also said that she was unaware of a family emergency involving Allen on February 29.

Tyneshie spoke with police on March 1, but at the time she said she did not suspect Allen had been involved in Neal's murder. But Tyneshie testified that she returned to speak with the police at a later time because Allen "had mentioned that he [had killed Neal]." Specifically, Tyneshie said that Allen told her that he and Neal had "got[ten] into it" and that "[Allen] shot him." Later, according to Tyneshie, Allen recanted this claim and instead said he was not involved in Neal's murder. Tyneshie said that she did not believe that Allen killed Neal.

Tyneshie admitted that Allen and Neal had "bumped heads" over Neal's not being involved in the twins' lives enough and that the two had previously "had words." But Tyneshie said that "it wasn't ongoing or anything like that." Tyneshie agreed that Allen and Neal knew each other and that Allen knew what Neal looked like.

Tyneshie testified that she did not initially tell police that Neal had told her that someone was following him because she "didn't want to be involved." She also said that she never saw Allen's car at the Chuck E. Cheese's the day she met up with Neal. Tyneshie stated that after Neal had called her and told her that someone was following him, she then spoke with Allen on the phone and learned that he was not at work. She said that she asked him whether he was following Neal and that Allen denied that he was. Tyneshie said that it was not unusual for Allen to leave work

15

early, especially if the two had argued, and that she believed he was going to his mother's house to talk to his mother, to whom he was close. She further stated that she had talked to Allen once more on the phone the night of February 29, and she believed that he was returning home from his mother's house. But she said that she did not actually see Allen until the next day and that he was acting "normal."

### N. John Witkowski

John Witkowski, a forensic scientist at DPS's Regional Crime Lab, testified. Witkowski said that he took samples from the Mercury Grand Marquis to test for gunshot primer residue (GSR). Specifically, Witkowski took "stubs" from the car's steering wheel; the console; the driver's side lower door; and the driver's side seat, seat top, armrest, headliner, and headrest. He then sent them for testing. Witkowski averred that he did not take samples from the backseat area of the car because Upshaw did not ask him to do so.

### O. Thomas White

Thomas White, a forensic chemist for DPS's Crime Laboratory Service, testified regarding the stubs that Witkowski had collected from the Mercury Grand Marquis for GSR particles. Regarding the samples collected from the headliner, White stated that he "confirmed the presence of three characteristic [GSR] particles." He added that there "were also two more particles" that contained higher levels of zinc than he would typically see in GSR, but he could not rule out that the particles were GSR. As to the samples he tested from the console, White said that he

confirmed the presence of three characteristic GSR particles and four particles that had elevated zinc levels; he also could not rule out those four particles as being GSR particles. And White confirmed two characteristic GSR particles from the front, driver's side armrest.

White said that he did not further test the other samples even though initial testing had demonstrated characteristics "indicative" of GSR particles because he had collected enough data from the three confirmed samples to substantiate his interpretation of the results that GSR particles were present in the car. White further said that even though other sources might generate the particles he found present, "those other sources have something else about them that would tend to point [him] away from them being" GSR particles. In sum, White said, "The presence of these particles means that either the surface in question was near a weapon when it was fired or came into contact with some other surface that already had GSR such as your hands."

**P. Lisa Upton**

Lisa Upton of DPS's Telecommunications Research Analysis Center testified that she performs cell phone analysis and cell tower mapping. Upton said that she analyzed call records pertaining to Neal's, Allen's, and Tyneshie's cell phones and that she specifically looked for their cell phones' location at Allen's home, the Chuck E. Cheese's in Grand Prairie, the 7-Eleven on Forest Hill Drive, the Valero on Forest

17

Hill Drive, and the intersection of Georgetown Drive and Peppermill Lane. The time frame she analyzed was between the hours of 4 p.m. and 8 p.m. on February 29.

As to Tyneshie's cell phone, Upton was able to determine that calls coming to and from Tyneshie's cell phone were pinging[4] off a cell tower near Chuck E. Cheese's prior to Neal's murder. She also determined that calls—including numerous calls between Tyneshie and Allen as well as multiple attempts by Tyneshie to call Neal—all occurred in an area near Allen's house after the time Neal was shot. Upton utilized a map as a demonstrative aide to explain her findings to the jury.

Specifically talking about Allen's cell phone, Upton explained that there were several calls made from Allen's cell phone to Tyneshie's just after 4 p.m. on February 29 and that the data revealed that Allen's phone would have been near his home or 3M. Upton said that around 6:00 p.m., Allen's cell phone began pinging off of the same cell towers near the Chuck E. Cheese's that Tyneshie's cell phone was pinging off of at the same time. Then, around the time of Neal's murder, Allen's phone began pinging off of towers near the intersection of Georgetown Drive and Peppermill Lane in Everman. From there, after Neal's murder, Allen's cell phone began to ping off of towers closer and closer to Allen's house.

---

[4]According to Merriam-Webster, "pinging" is the sending of "a signal to (a computer) in order to determine its status or the status of the connecting network." *Ping*, MERRIAM-WEBSTER ONLINE DICTIONARY 2020, http://www.merriam-webster.com/dictionary/ping (last visited Mar. 31, 2020). In cellular-tower vernacular, pinging refers to a cell phone sending a signal to a cell tower to determine the tower's availability and response time.

As to Neal's cell phone, Upton explained that Neal's phone was pinging off a tower near Chuck E. Cheese's just after 4:00 p.m. and that Neal's phone was pinging off of towers near the intersection of Georgetown Drive and Peppermill Lane in Everman just before he was shot. Upton said that the data revealed that there were multiple calls between King and Neal and Tyneshie and Neal around the time of the murder.

## Q. Mark Porter

Mark Porter, a forensic video analyst for the Tarrant County District Attorney's Office, testified. Porter said that he was responsible for recovering surveillance videos for the Texas Rangers from Chuck E. Cheese's in Grand Prairie and the 7-Eleven and Valero stores in Everman. While he was on the stand, the State introduced video footage from each of these three outlets.

Regarding the Chuck E. Cheese's surveillance video, the significant portion of the first video played for the jury showed Neal, Tyneshie, and her three daughters (including her twins with Neal) coming into the restaurant at 4:12 p.m. The second video from Chuck E. Cheese's showed Tyneshie and her three daughters walking through the Chuck E. Cheese's parking lot. Minutes later, a four-door car matching the description of Allen's car could be seen driving around the corner of the restaurant. Porter said that he was unable to determine whether the four-door car was a Mercury Grand Marquis or a Ford Crown Victoria (vehicles that Porter testified are both made by Ford and are essentially the same vehicle except that the Mercury

19

Grand Marquis has "a little more amenities" than a Crown Victoria). Porter also pointed out how I-20 could be seen in the background in this video.

Porter then described what he learned from the 7-Eleven surveillance video. Forty seconds into the clip, a large, yellow Penske truck could be seen driving past the front of the store heading southbound on Forest Hill Drive. Almost immediately behind it was a four-door vehicle that Porter described as "consistent" with the four-door vehicle seen in the Chuck E. Cheese's footage.

Next, the State played a surveillance clip for the jury that Porter had collected from the Valero as Porter described what the jury was seeing. Like in the 7-Eleven footage, in this clip a large, yellow Penske truck could be seen driving past the front of the store with a four-door vehicle following it. Porter said that the four-door vehicle was "visually consistent" with the four-door vehicle leaving Chuck E. Cheese's and following the truck in front of the 7-Eleven.

The State next played for the jury the home-surveillance video that captured the shooting. Then Porter testified that the large, yellow truck could be seen in the home-surveillance video stopping and backing up and that then a four-door vehicle "visually consistent" with the four-door vehicle in the previous three videos could be seen pulling up beside the truck. The home-surveillance video also showed flashes coming from inside the four-door vehicle; the vehicle pulling slightly forward and then stopping; and then the driver of the vehicle getting out of the vehicle, walking around the vehicle, standing over what appeared to be a person lying on the ground,

20

and firing two rounds from what appeared to be a handgun. The driver could then be seen getting back into the vehicle, and the vehicle could be seen driving away. After that, the video showed two people coming over to what appeared to be a person lying on the ground. From there, the video showed those two people running away and another person coming from the opposite direction, going over to the body, and lifting and holding the body until police arrived.

## R. The Verdict

After the State and the defense closed, the jury found Allen guilty of murder while using a firearm and the State's repeat-offender allegation to be true, and the trial proceeded to the punishment phase. Later, the jury assessed punishment at sixty years' confinement. The trial court rendered judgment accordingly, and this appeal followed.

## III. DISCUSSION

## A. Sufficiency of Evidence to Prove Identity

In his first point, Allen argues that the evidence was insufficient to prove that he was the person who shot Neal. Specifically, Allen argues that "[n]o witness identified Allen as the shooter" and that "[e]yewitness descriptions of the shooter did not match Allen, there was no evidence of how many individuals were in the car, and video evidence establishes that more than one individual was in the car." We disagree.

21

### 1. Standard of Review

Federal due process requires that the State prove beyond a reasonable doubt every element of the crime charged. *Jackson v. Virginia*, 443 U.S. 307, 316, 99 S. Ct. 2781, 2787 (1979); *see* U.S. Const. amend. XIV. In our due-process evidentiary sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017). This standard gives full play to the factfinder's responsibility to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Queeman*, 520 S.W.3d at 622.

The factfinder alone judges the evidence's weight and credibility. *See* Tex. Code Crim. Proc. Ann. art. 38.04; *Queeman*, 520 S.W.3d at 622. We may not re-evaluate the evidence's weight and credibility and substitute our judgment for the factfinder's. *Queeman*, 520 S.W.3d at 622. Instead, we determine whether the necessary inferences are reasonable based on the evidence's cumulative force when viewed in the light most favorable to the verdict. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015); *see Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017) ("The court conducting a sufficiency review must not engage in a 'divide and conquer' strategy but must consider the cumulative force of all the evidence."). We must presume that the

22

factfinder resolved any conflicting inferences in favor of the verdict, and we must defer to that resolution. *Murray*, 457 S.W.3d at 448–49.

To determine whether the State has met its *Jackson* burden to prove a defendant's guilt beyond a reasonable doubt, we compare the crime's elements as defined by the hypothetically correct jury charge to the evidence adduced at trial. *See Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016); *see also Febus v. State*, 542 S.W.3d 568, 572 (Tex. Crim. App. 2018) ("The essential elements of an offense are determined by state law."). Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Jenkins*, 493 S.W.3d at 599. The "law as authorized by the indictment" means the statutory elements of the charged offense as modified by the factual details and legal theories contained in the charging instrument. *See id.*; *see also Rabb v. State*, 434 S.W.3d 613, 616 (Tex. Crim. App. 2014) ("When the State pleads a specific element of a penal offense that has statutory alternatives for that element, the sufficiency of the evidence will be measured by the element that was actually pleaded, and not any alternative statutory elements."). The standard of review is the same for direct and circumstantial evidence cases; circumstantial evidence is as probative as direct evidence in establishing guilt. *Jenkins*, 493 S.W.3d at 599.

23

## 2. Analysis

As charged in the indictment, the jury found Allen guilty of intentionally or knowingly shooting Neal to death with a firearm. *See* Tex. Penal Code Ann. § 19.02. Allen challenges the sufficiency of the identification evidence.

Viewing the evidence in a light most favorable to the jury's verdict, the record shows that Allen disliked Neal and had previously "had words" with Neal about how uninvolved he was with his and Tyneshie's twins. Not only did Tyneshie testify to this, but King also testified that he knew Allen had "problems" with Neal, that Allen did not want Neal around, and that Allen wanted to have Neal's parental rights to his daughters terminated. The jury also had before it evidence that Allen was upset with Tyneshie about their separation and that Tyneshie, who had sent Neal a nude photograph of herself, had thought about having a relationship with Neal. The reasonable inference from this evidence is that Allen had multiple reasons to want Neal out of his, Tyneshie's, and the twin's lives.

The record shows that Allen left his job early under the guise of a family emergency at the time when Neal had met Tyneshie at the Chuck E. Cheese's. The State presented cell tower evidence and surveillance footage from multiple locations demonstrating that Allen's cell phone followed Neal's path from the restaurant to the intersection where he was murdered. The cell tower evidence and surveillance footage also provided visual evidence that a vehicle matching Allen's vehicle followed

Neal along that path. Further, the cell tower data traced Allen's phone from the murder scene back to Allen's home just after the shooting.

The record further shows that at the time of the murder, Allen drove a 2005 Mercury Grand Marquis, and King testified that Neal told him that either a Mercury Grand Marquis or "Crown Vic" was following him. The jury heard evidence that a Mercury Grand Marquis is almost identical to a Ford Crown Victoria. King also said that Neal told him that it was his "baby mother's husband" who was following him—Allen was Tyneshie's husband at the time of the murder, and she was the mother of Neal's daughters. King further said that Neal told him that Tyneshie had said that it was Allen following Neal. The State also put on evidence that at the time Neal was being followed, Tyneshie was frantically calling Neal to see if he was "okay" and that she was also attempting to call Allen during the same time frame. A reasonable inference from this is that Tyneshie knew that it was Allen following Neal and that Neal was in danger.

The jury also heard evidence that Neal returned his Mercury Grand Marquis to the dealership for voluntary repossession the day after the murder, even though he had never missed a car payment and had, in fact, made a payment two days before the murder. A reasonable inference from this is that Allen was trying to hide evidence, demonstrating a consciousness of guilt. *See Ross v. State*, 154 S.W.3d 804, 812 (Tex. App.—Houston [14th Dist.] 2004, pet. ref'd) ("A defendant's conduct after the commission of a crime which indicates a 'consciousness of guilt' is admissible to

25

prove that he committed the offense."). The record also shows that Allen told Tyneshie that he had committed Neal's murder but that he later recanted the confession. His changing stories along with his attempt to create an alibi by telling his manager he had a family emergency also demonstrate that Allen possessed a consciousness of guilt. *See Couchman v. State*, 3 S.W.3d 155, 164 (Tex. App.—Fort Worth 1999, pet. ref'd) (holding that defendant's changing story was evidence of a consciousness of guilt).

Moreover, the jury had watched video footage showing the shooter getting out of the driver's side of a car that investigators deemed "visually consistent" with Allen's Mercury Grand Marquis. The jury saw in that video where the shooter got back into the driver's seat of the car and sped away. And the jury heard evidence that GSR particles were found in multiple places surrounding Allen's driver's seat and that this was consistent with someone either firing a gun from the driver's seat or touching the area around the driver's seat after having fired a gun.

Allen argues that because multiple witnesses gave a description of the shooter inconsistent with his own height, the evidence supports that he was not the shooter. Allen also argues that because multiple witnesses identified the color of the shooter's car differently, the State failed to establish that it was his car that was involved in the murder. But the jury also heard evidence that the shooter's car was visually consistent with Allen's Mercury Grand Marquis. And Upshaw testified that he was not concerned with the discrepancies between the eye-witnesses' reports, stating that he

26

would expect such discrepancies when a firearm is involved because witnesses have a tendency to focus on a weapon when seeing a crime committed. Indeed, the State's first eyewitness, Thomas, testified that as she watched the shooter fire at Neal, she was mainly focused on the handgun, that she was not wearing her glasses, and that the only thing she could truly see "was a fire coming out of the gun." Further, the jury was free to believe some of the eyewitness testimony and reject other evidence and resolve any conflict in testimony as well as to determine the weight and credibility to be given to the evidence. *Balderas v. State*, 517 S.W.3d 756, 766 (Tex. Crim. App. 2016) ("When the record supports conflicting inferences, we presume that the jury resolved the conflicts in favor of the verdict, and we defer to that determination.").

Allen also claims that the video evidence demonstrates that there was more than one person in the shooter's car because, according to Allen, video evidence shows gunshots coming from the backseat prior to the driver getting out and shooting Neal as he was on the ground. This is simply not true. The surveillance video that Upshaw collected from a neighbor's house shows where flashes can be seen coming from the car and then the driver getting out of the car and more flashes coming from the gun as Neal was on the ground. The video is of poor quality, and the lighting is poor as well. It is impossible to tell from the video whether the flashes from inside the car originated from the front seat or the back, or whether the shooter was shooting from the front seat through the backseat. Further, both Thomas and Rappa testified that they did not see another person in the car as the murder occurred. This

27

alleged inconsistency in the evidence was also a determination that we must defer to the jury. *Id.*

We conclude that a rational factfinder could have found beyond a reasonable doubt that Allen intentionally or knowingly shot Neal to death with a firearm. *See Queeman*, 520 S.W.3d at 622. We overrule Allen's first point.

## B. Admissibility of Cell Phone Records

In his second point, Allen argues that the trial court abused its discretion by overruling his objection to the admissibility of cell tower records because the records were searched pursuant to an invalid warrant. Allen argues that because the warrant affidavit did not identify the cell phone's owner, it did not meet the requirements of Texas Code of Criminal Procedure Article 18.0215, and the warrant issued based on that affidavit was therefore invalid. *See* Tex. Code Crim. Proc. Ann. art. 18.0215.

### 1. Standard of Review

When reviewing a magistrate's decision to issue a warrant, we "apply a highly deferential standard in keeping with the constitutional preference for a warrant." *Rodriguez v. State*, 232 S.W.3d 55, 61 (Tex. Crim. App. 2007). Thus, when we review an issuing magistrate's determination, we "interpret the affidavit in a commonsensical and realistic manner, recognizing that the magistrate may draw reasonable inferences," and "[w]hen in doubt, we defer to all reasonable inferences that the magistrate could have made." *Id.*

28

## 2. Warrant Requirements

"No search warrant shall issue for any purpose in this state unless sufficient facts are first presented to satisfy the issuing magistrate that probable cause does in fact exist for its issuance." Tex. Code Crim. Proc. Ann. art. 18.01(b). The Code of Criminal Procedure provides that a warrant may be issued to search for and seize "electronic customer data held in electronic storage, including the contents of and records and other information related to a wire communication or electronic communication held in electronic storage." *Id.* art. 18.02(13). "Electronic customer data" is "data or records that . . . are in the possession, care, custody, or control of a provider of an electronic communications service or provider of a remote computing service." *Id.* art. 18B.001(7)(A).

The Code also permits the issuance of a search warrant for "a cellular telephone or other wireless communications device." *Id.* art. 18.02(14). But "[a] peace officer may not search a person's cellular telephone or other wireless communications device, pursuant to a lawful arrest of the person without obtaining a warrant under" Article 18.0215.[5] *Id.* art. 18.0215(a). The application for the warrant must contain information specified in that Article, including "the name of the owner or possessor of the telephone or device to be searched." *Id.* art. 18.0215(c)(3).

---

[5]As the State points out, there are few courts in Texas that have addressed Article 18.0215. *See, e.g., Mitchell v. State*, No. 05-16-00070-CR, 2016 WL 7163947, at *2, n.4 (Tex. App.—Dallas Nov. 30, 2016, pet. ref'd) (mem. op., not designated for publication); *King v. State*, No. 03-17-00276-CR, 2018 WL 5728765 (Tex. App.—Austin Nov. 2, 2018, pet. ref'd) (mem. op., not designated for publication).

### 3. Article 18.0215 Not Applicable

Under its plain language, Article 18.0215 applies to warrants to search and seize devices and does not apply to an application for a warrant for electronic customer data held by a third person. *See id.* arts. 18.02 (allowing for the issuance of a warrant for wireless devices and requiring compliance with Article 18.0215 but allowing for warrants for electronic data without reference to Article 18.0215), 18.0215 (discussing requirements for warrants for a "cellular telephone or other wireless communications *device*" (emphasis added)). Here, the warrant affidavit at issue was for a warrant for electronic *data* held by the service provider for Allen's cell phone. It was not a warrant affidavit utilized to seek a warrant to search Allen's cell phone *device.* Accordingly, Article 18.0215 does not apply. *See id.* art. 18.0215. Thus, we overrule Allen's second point.

## C. Admissibility of Greenberg's Testimony

In his third point, Allen argues that the trial court's admission of Greenberg's testimony about "the results of an autopsy performed by another medical examiner violated the Confrontation Clause." The State responds that Greenberg did not sponsor the other doctor's autopsy report and did not act as a surrogate for that doctor, but rather presented her own opinion "based on her independent review of the autopsy report and autopsy photographs, along with her expertise gained from conducting numerous autopsies."

### 1.  Rule 703 and Standard of Review

A trial court's ruling on the admissibility of expert testimony is reviewed for an abuse of discretion and will not be disturbed if it is within the zone of reasonable disagreement. *Wolfe v. State*, 509 S.W.3d 325, 343 (Tex. Crim. App. 2017). Under Texas Rule of Evidence 703, an expert witness may base an opinion on facts or data that are not admissible in evidence, provided that the inadmissible facts or data are of a type reasonably relied upon by experts in the particular field. Tex. R. Evid. 703. The Confrontation Clause is not violated merely because an expert bases an opinion on inadmissible testimonial hearsay. *Wood v. State*, 299 S.W.3d 200, 213 (Tex. App.— Austin 2009, pet. ref'd) (citing *Crawford v. Washington*, 541 U.S. 36, 59, 124 S. Ct. 1354, 1369 (2004)). This is because the testifying expert's opinion is not hearsay and the testifying expert is available for cross-examination regarding her opinion. *Id.* But when an expert discloses to the jury inadmissible testimonial statements from an autopsy report on which her opinions are based, such disclosure constitutes use of testimonial statements to prove the truth of the matters asserted and violates the Confrontation Clause. *Id.* at 210.

### 2.  Analysis

Here, Greenberg did not disclose the testimonial hearsay upon which her expert opinion was based; the jury heard only her direct, in-court testimony. And Greenberg specifically testified that she was stating her own opinion based on the report and not on statements made in the report.

31

Allen argues that because Greenberg did not perform the autopsy, her testimony about the fatal wounds and their wound tracks must have been based on the autopsy rather than her own independent opinion formed by reviewing the autopsy. But Allen does not point this court to any specific statement by Greenberg where she disclosed to the jury the testimonial statements contained in the autopsy report. Thus, he has failed to show how Greenberg violated his Confrontation Clause rights. *See Hutcherson v. State*, 373 S.W.3d 179, 183–84 (Tex. App.—Amarillo 2012, pet. ref'd).

Without citing any authority for the proposition, Allen further argues that because the original doctor who performed the autopsy later amended his report, Greenberg inherently relied on the testimonial statements in the autopsy report rather than offering her own opinion. But again, Allen does not point to any specific statement by Greenberg where she disclosed to the jury the testimonial statements contained in the autopsy report. Allen also seems to take issue with Greenberg's testimony being based on what he deems low-quality, autopsy photographs. But it is well-settled that an autopsy photograph is not a testimonial statement under the Confrontation Clause. *Herrera v. State*, 367 S.W.3d 762, 773 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Thus, to the degree that Greenberg's testimony relied on nontestimonial photographs, Allen's Confrontation Clause rights were not violated.

Because Allen has not showed where Greenberg disclosed to the jury the testimonial statements contained in the autopsy report, Allen's Confrontation Clause

rights were not violated. *See Hutcherson*, 373 S.W.3d at 183 (holding that medical examiner could testify to opinion regarding cause of death even though he did not perform autopsy); *Gilstrap v. State*, No. 04-09-00609-CR, 2011 WL 192688, at *1–2 (Tex. App.—San Antonio 2011, pet. ref'd) (mem. op., not designated for publication) (same). The trial court did not abuse its discretion by admitting Greenberg's testimony over Allen's objection. We overrule Allen's third point.

## IV. CONCLUSION

Having overruled all three of Allen's points on appeal, we affirm the trial court's judgment.

/s/ Dana Womack

Dana Womack
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: April 2, 2020